Feb. 2,
1937.

OPINION OF THE JUSTICES.

*To His Excellency the Governor and the Honorable Council:*

The resolution of the Governor and Council passed December 28, 1936, relates to a project for the construction by a state agency of a dam across the Connecticut River in Pittsburg. As our opinion should not go beyond assistance to you in the performance of your executive duties (*Opinion of the Justices,* 73 N. H. 621; *Opinion of*

*the Justices*, 75 N. H. 613, 614), we have considered the questions submitted only as they bear upon the validity of the Pittsburg project.

We answer the first question in the affirmative. In reaching this conclusion we have considered whether the act (Laws 1935, *c.* 121) in reality proposes to grant public aid to private industry. To the extent of such a purpose it would be invalid.

It is a recognized principle of constitutional law that taxes may not be imposed for the benefit of private persons or for private uses. *State* v. *Company*, 60 N. H. 219; *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, and cases cited.

"It is an underlying principle of our government that money raised by taxation can be used only for public purposes and not for the advantage of private individuals. 'The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare is, in its essential character, a private and not a public object.' *Lowell* v. *Boston*, 111 Mass. 454, 460, 461." *Opinion of the Justices*, 231 Mass. 603, 611, 612. "It may therefore be safely asserted that taxation for the purpose of raising money from the public to be given or even loaned to private persons, in order that they may use it in their individual business enterprises, is not recognized as an employment of the power for a public use." Cooley, Taxation, (4th *ed.*) *p.* 466.

The prosperity of a particular private industry may be a matter of public concern but such an industry may not be aided at the expense of the state. There is no power of the legislature to pass "wholesome and reasonable" laws if they are "repugnant or contrary to" the constitution. Const., Pt. II, *Art.* 5. The subject is fully considered in *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, 11, 12, and the decision in that case is of authority which we do not regard as doubtful.

How far a public utility may be state aided, is a question not so readily answered. As defined by statute (P. L., *c.* 236, *s.* 4), such a utility is an enterprise for furnishing the public with various forms of stated service, of which electricity, with its products of light, heat and power, is one. Railroads are not included, although in the legal

aspects of relationship with the public and of regulatory control they are closely allied with utilities.

In *Perry* v. *Keene*, 56 N. H. 514, the legislature was held to have the right to authorize towns to appropriate money to aid in railroad construction. In *State* v. *Railroad*, 75 N. H. 327, 337, 338, the subject is thus discussed: "The legislature has authority to use the powers and funds of the state to secure the construction and maintenance of railroads . . . The legislature has no authority to grant a public bounty, except in aid of a public purpose. *Perry* v. *Keene*, 56 N. H. 514. Such a grant is therefore always subject to the condition or trust that the corporation shall assume an obligation to the state to fulfill the purpose of the grant. . . . The aid may be in the form of a donation of funds, a grant of a monopoly, or a delegation of the power of eminent domain. The trust upon which a railroad receives any of these public bounties is that it will maintain its road as a thoroughfare for the benefit and use of the public upon the payment of reasonable charges." In *Canaan* v. *District*, 74 N. H. 517, in which the exemption from taxation of property situated in a town and owned and used for public purposes by another municipality was in issue, the court stated the proposition that "If the ownership were entirely private, such private character would not invalidate a general tax exemption granted by the legislature under constitutional power to provide for the common benefit, protection and security."

The view that to justify public aid to a private enterprise serving a public purpose, there must be some obligation to the public assumed by the enterprise in consideration for the aid is discussed in *Eyers Woolen Co.* v. *Gilsum*, *supra*, 15, 16, with reference to the distribution of electricity, which of itself is said not to be a public use or purpose, and the distributor of which must be more than "a strictly private corporation," to entitle the legislature to confer quasi-governmental privileges upon it. The public must acquire a right. There must be a "trust imposed upon the donation." If the distributor "is in fact a public agent exercising powers for the public advantage, which are subject to legislative control and enforcement," (*McMillan* v. *Noyes*, 75 N. H. 258, 263), it has met the test of eligibility.

But there still remains the question of the degree and manner to and in which public aid may be granted. The grant of the power of eminent domain is less doubtful than that of a grant of money or of a tax exemption. In eminent domain the owner whose property

is taken is merely forced to exchange it for its value. He makes no contribution and suffers no loss. There is full and measured restitution for the seizure of his property. *Eyers Woolen Co.* v. *Gilsum, supra,* 13. Similarly, in the grant by the state of a monopoly or exclusive privileges, what is taken from others is not what they have but only the opportunity to acquire. It is more a matter of regulation in the public interest than an exaction from individuals.

In the case of a utility, the enterprise is primarily undertaken by reason of the profit motive. A venture involving service to the public is regarded prospectively by its promoters as one of financial success to its owners. It is as a money making business that it is entered into and engaged in. Service to the public is thought to be sufficiently promising of a return on the investment to induce it. Whatever direct aid it receives from the public helps it. The public is benefited from the aid it grants because the aid helps to obtain or improve or maintain the service. But the public need of the creation, maintenance or increase of the service must exist to justify the aid therefor. It must be given for the public use and purpose, and if the public is already adequately served, its aid is essentially for a private purpose. The indirect public advantage of industrial welfare and general prosperity is not a valid reason for the aid. Even if the public advantage takes specific form, such as work for those in need of employment and without employment dependent on public assistance, public aid to the employer is a violation of the constitutional principle against taxation for private purposes. Avoidance of proper public charges may not be accomplished by financial assistance to a private enterprise. If, to attain a proper objective of government, financial assistance might be thus furnished an existing enterprise, it would be equally valid to furnish it to establish a new one.

The woolen mill in the small town of Gilsum may have been as much needed for the town's healthy economic life as the Manchester and Keene Railroad was for the city of Keene, in proportionate equality. But public aid to the mill was forbidden by reason of its wholly private character. No public service was to be rendered in return for the aid. So, with the railroad and the utility, if the aid does not impose the obligation of the service, it is improperly granted. Aid to a utility is forbidden except in protection of the public welfare and interest. And the protection must be in a needed service furnished the public by the utility as a condition of the aid. Without the condition the protective principle is inapplicable. Unconditional

aid is not a proper charge of government to be met by the taxpayers.

It appears here that the three utilities with which it is proposed to make contracts all transmit electric energy outside the state. They produce more than is needed for local use. In such transmission beyond the state they are serving no public purpose, but are engaged in private industry. Their obligation to furnish adequate local service is already secured. Their need of further facilities and development, at present at least, is wholly private. In this state of matters our opinion is that specific aid to them is at this time forbidden. The constitutional provision that government is "instituted for the common benefit. . . of the whole community, and not for the private interest or emolument of any one man, family, or class of men" (Const., Pt. I., *Art.* 10), is controlling.

As a corollary to the prohibition against taxation to aid a private purpose, legislation resulting in or leading to taxation therefor is also invalid. The legislature may not exercise or delegate its taxing power for private benefit through the indirect expedient of an exemption. *Eyers Woolen Co.* v. *Gilsum, supra.*

An appropriation of public money for a private purpose is forbidden, whether the money therefor is to be raised in the first instance by borrowing or by a tax levy. If the money is borrowed, there is the obligation of ultimate taxation for the payment of the loan. No less is the pledge of the public credit, or its guaranty, for a private obligation void. An obligation which may require money to be raised eventually by taxation to meet it stands on equal footing with one that is certain to do so.

Considering the act under this test of public or private benefit, its declared purpose that projects be undertaken by the state for "the conservation, development, storage, distribution and utilization of water" is in promotion of "the benefit and welfare of this state" (Const., Pt. II, *art.* 5), and the projects are of a public nature which the state may execute and administer. Without expressing opinion on the inquiry how far the state may engage in business enterprises and undertakings generally, the projects for which the act provides are so far public in character that they are subject to no constitutional prohibition as state enterprises.

The power of the legislature to grant to municipalities authority to establish and maintain local water-supply works and electric plants has had unquestioned acceptance and the right of the state itself to engage in similar activities, partaking of an interest peculiarly public, can be no less. "Towns are but subdivisions of the State,

given certain governmental powers and charged with some local government duties. Any part or all of the local duties and obligations may be assumed by the state." *Opinion of the Justices*, 84 N. H. 559, 578. If municipal enterprises are legitimate, the state also may undertake them.

A secondary plan and scheme of the act, ultimately to throw the expense of a project, in whole or in part, on those specially benefited by the project, is not objectionable. It is not different in principle from a provision for tolls in the use of a publicly constructed and maintained highway or for charges for water and electric service furnished by municipally owned works or plants. A project otherwise valid is not defeated because entire or partial relief from the tax burden incurred in paying for it is arranged.

It has been suggested that the act authorizes projects from which the state will derive but slight advantage as compared with the benefit therefrom to a few individuals. The Pittsburg project is cited in illustration. The chief benefit, it is said, will be to owners of water power on the Connecticut River, of whom the number is small. But if this is the situation, we see no character of the act as inherently designed primarily to aid private industry. The public benefit intended to flow from the projects may be incidentally accompanied by special benefit to certain members of the public, or by greater benefit to some of the public than to others without altering or modifying their public integrity. In a standard example, the public at large receives benefit from public education, while those receiving education enjoy special personal benefit.

In the construction of statutes, a rule of favor is applied by which doubts of meaning and effect are to be resolved so as to sustain them if in reason they may be. A legislative declaration of purpose is ordinarily accepted as a part of the act, under the principle of policy that "The declared purpose of a legislative enactment is to be accepted as true unless incompatible with its meaning and effect." (*Lajoie* v. *Milliken*, 242 Mass. 508, 521.) And there is a general rule that "When a statute, unsustainable in its literal terms, is valid in some of its applications but not in others, it is to be read as though the latter were excepted from its operation." *Woolf* v. *Fuller*, 87 N. H. 64, 69 and cases cited. The fact that the public benefit is not uniformly widespread and inures more directly to the advantage of a particular area or of a particular class of persons does not offend the principle of equality. "The equality of the constitution is the equality of persons and not of places—the equality of right and not

of enjoyment." *State* v. *Griffin*, 69 N. H. 1, 30. Although the class of persons specially affected may be small in number or the area directly involved is not of large extent, inequality is not thereby produced if the classification is reasonable or if the area is not defined in unreasonable discrimination of favor or disfavor. "Their service is no less public because it does not extend through the whole state." *Canaan* v. *District*, 74 N. H. 517, 547.

The act contains no provisions or implied authority for public aid to any individual enterprise. The benefit any one may receive is general to it as a member of the public.

It is possible that some special features of the act may be invalid. We have not examined the act beyond meeting your present needs of our opinion. It is therefore to be understood that this opinion is thus restricted. A section (*s.* 22) of the act provides in effect that the invalidity of any part of it shall not destroy the act as a whole if its general purpose can be carried into effect, notwithstanding such invalidity. This is a valid saving clause. It restates and affirms the unwritten law on the point. *Opinion of the Justices*, 76 N. H. 601, 605. Assuming the possibility of some features of invalidity, we are of the opinion, from the consideration we have given, that there are none which are so interrelated with the others and so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the structure. The fundamental framework of the act we think contains no violation of constitutional restrictions or prohibitions. There being in our opinion no general invalidity of the act, it follows that the state may constitutionally pledge its credit for the authorized obligations of the state agency created by the act to construct and maintain the projects for which the act provides.

In answer to the second question, we cannot say whether the Pittsburg project may be validly carried out according to the plan and program therefor. The problem is one of application of the purposes of the act to the project. What the actual purposes of the project are, we may not declare. The inquiry in respect thereto is one of fact, as to which no authoritative finding has been made and which it is not our province to ascertain. It is stated in the resolution that the state agency proposes to construct the Pittsburg dam "for the purposes of controlling flood waters of the Connecticut River, minimizing flood damage to . . . public and private property along said river, conserving and equalizing the flow thereof for the benefit of public utilities and other users of water power below the proposed dam,

purifying the flow thereof during periods of low water, and enhancing the recreational resources of the state, all in the interest of the public." We may not accept this statement of purposes to be true, since it lacks judicial test of probative evidence. In our opinion the policy to adopt a legislative declaration of purpose in an act as true is not to be extended to an assertion by one executive board of the purposes of another. It does not appear that there has been any administrative hearing and finding by your predecessors of the agency's purpose in undertaking the Pittsburg project, and until the purpose is thus determined by you, your authority to act upon the proposed grant of the state's credit we think is lacking.

The evidence presented has some tendency to show a purpose to aid private industry. The unique arrangement for the formation of a state agency as a corporate entity is not by itself significant on the point. Its creation was evidently designed to avoid the state's direct incurment of debt or obligation. By the act the state is to be obligated only to the extent the authorized pledge of its credit for the bonds or notes of its agency is exercised by the Governor and Council. Although only a state instrumentality, the act in effect disclaims state responsibility for its obligations, except as it specially provides for such responsibility. Hence there can be no occasion for the state to levy taxes to meet the agency's obligations not specifically guaranteed by the state.

But in the averment of the agency's purposes, one is stated to be to regulate the flow of the Connecticut River "for the benefit of public utilities and other users of water power" thereon. And the form of contract proposed to be entered into between the agency and three utilities owning water power on the river has some force in indicating a purpose of aid to private enterprises as a controlling reason for the project. Such a purpose, if a controlling one, would make the execution of the project unauthorized. The legislature has sanctioned no such undertaking, and for the reasons already appearing we think it could not validly do so under existing conditions.

The proposal is for three users of developed water power on the river, by separate contracts with each to pay between them for the entire cost of the construction and maintenance of the project, the cost of construction to be spread over a period of years during which maintenance costs shall be added as an annual item. The contract provides for additional or reduced payments according to variations in construction costs from the estimates, and also for reductions if contracts for payments by other users are made.

By section 11 of the act the state agency is to appoint a committee "to regulate and direct the release of stored water from each reservoir at such times and in such quantities as shall be most beneficial to water users under contracts" made under authority of the act "and not inconsistent with the public use and benefit . . . ." The contracts provide for such a committee consisting of one member representing the public and one designated by each contracting user of water for each 200 feet of head used by it. Incidentally, in thus delegating the major part of its appointing power to the utilities, the agency would seem clearly to exceed its authority in an *ultra vires* manner.

It thus appears that the project is undertaken on the strength of contracts with particular users of water. Not only do they contract to reimburse the state and its agency for its expenses, but through attempted majority representation on the water regulation committee, they seek to control the supply and release of stored water from the reservoir.

According to the resolution, the agency proposes to make the contracts with the three utilities before it contracts for the construction of the project and before it issues bonds. And the bonds are to be in part secured by pledge of the payments to be made by the utilities.

From all this evidence it may be that the public benefit designed to ensue from the project is incidental to that to accrue to the three utilities and such other water users as might later participate with them. If particular users of water are to be the beneficiaries of the project, with the public deriving only indirect advantage from it, it would not be within the agency's power to execute, so as to give it the power of eminent domain or so as to permit you to pledge the state's credit for any of its obligations, or so as to permit it to use any of the enacted appropriation of money therefor.

You are not to understand that we think a finding of a purpose of private benefit to which public benefit is incidental, in connection with the project, ought to be made. We merely say that from the evidence before us, it reasonably might be. It is only a part of all the evidence, we assume. If, as a fact, the purpose of the project is confined to the legislature's declared objects, and free from any character as an undertaking for which benefit to particular persons or private enterprises is its substantial inducement, the state's credit may be given to the agency's bonds to the extent proposed, and the agency may exercise the power of eminent domain in acquiring the necessary rights for constructing its dam and for reservoir

494

purposes. Otherwise stated, if development of electric energy in the use of the water of the river as promotive of the state's industrial and economic welfare is the controlling element of consideration and is in mind as the inducement and goal sought by the contracts, they may properly be entered into. If the particular utilities are in mind, to be aided in the improvement and increase of their water power, which they are to pay for through use of the state's credit, the agency's power to contract therefor has not been granted.

JOHN E. ALLEN.
THOMAS L. MARBLE.
OLIVER W. BRANCH.
PETER WOODBURY.
ELWIN L. PAGE.

February 2, 1937.

*Fred C. Demond* (by brief and orally), and *Robert W. Upton*, (by brief), for the New Hampshire Water Resources Board.