Belknap No. 80-017
Strafford Nos. 80-099, 80-136 and 80-191
Hillsborough No. 80-252
U.S. District Court No. 80-273
Sullivan No. 80-291

KENNETH E. CARSON v. L. HERBERT MAURER, M.D.

DIANE C. ARMY v. WILLIAM CUSACK, JR., M.D. & a.

TIMOTHY WILLIAMS & a. v. CHARLES C. THOMPSON, M.D. & a.

DENISE JEAN & a. v. NORMAN CRISP, M.D. & a.

THOMAS T. TAYLOR v. HITCHCOCK CLINIC, INC. & a.

THEODORE J. BONNEAU & a. v. HITCHCOCK CLINIC, INC. & a.

December 31, 1980

*Kenneth E. Carson,* f/n/f Kimberly Carson and as administrator

of the estate of Kimberly Carson, by brief and orally, pro se (80-017).

*Wiggin & Nourie*, of Manchester (*Richard B. McNamara* orally), for the plaintiff Diane C. Army (80-099).

*Burns, Bryant, Hinchey, Cox & Shea*, of Dover, and *Shuman, Ross & Spiliakos*, of Boston (*Howard S. Ross* orally), for the plaintiffs Timothy Williams and Cynthia Williams (80-136; 80-191).

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Jack B. Middleton* and *Bruce W. Felmly* orally), for the plaintiffs Denise Jean, Dennis Jean, E. Harlan Connary and Patricia Connary (80-252).

*McSwiney, Jones & Semple*, of Concord (*Carroll F. Jones* orally), for the plaintiff Thomas T. Taylor, as administrator of the estate of Laura R. Taylor, and individually (80-273).

*Brown & Nixon*, of Manchester (*Michael P. Hall* orally), for the plaintiffs Theodore J. Bonneau and Norah M. Bonneau (80-291).

*Wadleigh, Starr, Peters, Dunn & Kohls*, of Manchester (*Theodore Wadleigh* orally), for the defendants Mary Hitchcock Memorial Hospital and Wentworth-Douglas Hospital (80-099; 80-273).

*Bell, Falk & Norton*, of Keene (*Ernest L. Bell, III*, orally), for the defendant Charles C. Thompson, M.D. (80-136; 80-191).

*Orr & Reno*, of Concord, by brief for the defendant Hitchcock Clinic, Inc. (80-273).

*Sulloway, Hollis & Soden*, of Concord (*Martin L. Gross* and *Warren C. Nighswander* orally), for the defendants William E. Cusack, Jr., M.D., L. Herbert Maurer, M.D., Norman Crisp, M.D., Robert Hinckley, M.D., Julie Stiles, M.D., and Mary Hitchcock Memorial Hospital (80-017; 80-099; 80-252; 80-291).

PER CURIAM. The plaintiffs in these consolidated appeals challenge the constitutionality of RSA ch. 507-C (Supp. 1979), governing actions for medical injury.

The plaintiffs here are also plaintiffs in underlying actions for medical injury; the defendants are medical care providers. In three of the actions below (Nos. 80-017, 80-099 and 80-136) the court granted the defendants' motions to dismiss for failure to comply with the notice requirement of RSA 507-C:5 (Supp. 1979), and the plaintiffs appealed. The plaintiffs in 80-136 then moved to amend their complaint to reflect compliance with RSA 507-C:5

(Supp. 1979); the trial court denied this motion, and the plaintiffs also appealed that ruling (80-191). Two other actions (Nos. 80-252 and 80-291) are here on interlocutory transfers without ruling from the Hillsborough and Sullivan County Superior Courts, and a third action (No. 80-273) is here on certification from the United States District Court for the District of New Hampshire.

## I. *Introduction*

The statute in question is part of an effort by the legislature to address the problems of the medical injury reparations system. In enacting RSA ch. 507-C (Supp. 1979), the legislature set forth rigorous standards for qualified expert testimony, created a two-year statute of limitations applicable to most medical malpractice actions, required that notice of intent to sue be given at least sixty days before commencing the action, prohibited the statement of the total damages claimed as an ad damnum or otherwise, abolished the collateral source rule, limited the amount of damages recoverable for non-economic loss to $250,000, empowered the court to order periodic payments of any future damages in excess of $50,000, and established a contingent fee scale for attorneys in medical malpractice actions.

In enacting RSA ch. 507-C (Supp. 1979), the legislature sought to contain the costs of the medical injury reparations system by revising and codifying the applicable tort law. In its statement of findings and purpose, the legislature found

> ". . . that substantial increases in the incidence and size of claims for medical injury pose a major threat to effective delivery of medical care in the state and that the risks and consequences of medical injury must be stabilized in order to encourage continued provision of medical care to the public at reasonable cost, the continued existence of medical care institutions and the continued readiness of individuals to enter the medical care field."

Laws 1977, 417:1. Accordingly, RSA ch. 507-C (Supp. 1979) was intended to codify and stabilize the law governing medical malpractice actions and to improve the availability of adequate liability insurance for health care providers at reasonable cost. Laws 1977, 417:1 II, III.

The plaintiffs first argue that RSA ch. 507-C (Supp. 1979) violates the equal protection guarantees of the United States and New Hampshire Constitutions, U.S. CONST. Amend. XIV, § 1;

N.H. CONST. pt. 1, arts. 2 and 12, in that it improperly singles out victims of medical negligence, as distinct from victims of other kinds of negligence, for harsh treatment by restricting the means by which they may sue and the damages they may recover for their injuries.

The medical malpractice statute establishes several classifications. First, it confers certain benefits on tortfeasors who are health care providers that are not afforded to other tortfeasors. Conversely, it distinguishes between those tort claimants whose injuries were caused by medical malpractice and all other tort claimants. The statute also distinguishes between medical malpractice victims whose non-economic loss exceeds $250,000 and those whose non-economic loss is $250,000 or less and between malpractice victims whose future damage awards exceed $50,000 and those who are awarded $50,000 or less for future damages. The issue is whether any of these classifications violates the equal protection mandate that "those who are similarly situated be similarly treated." *Estate of Cargill v. City of Rochester*, 119 N.H. 661, 665, 406 A.2d 704, 706 (1979), *quoting Belkner v. Preston*, 115 N.H. 15, 17, 332 A.2d 168, 170 (1975).

■ ■ The plaintiffs contend that RSA ch. 507-C (Supp. 1979) impinges upon the exercise of their allegedly fundamental right to be indemnified for personal injuries, and that the statute is therefore unconstitutional unless supported by a compelling state interest. We have held, however, that the right to recover for one's injuries is not a fundamental right, *Estate of Cargill v. City of Rochester*, *supra* at 666, 406 A.2d at 707, and courts in other jurisdictions have reached a similar conclusion in examining their states' medical malpractice statutes. *See American Bank & Trust v. Community Hospital*, 163 Cal. Rptr. 513, 517 (Cal. App. 1980); *Jones v. State Board of Medicine*, 555 P.2d 399, 410 (Idaho 1976), *cert. denied*, 431 U.S. 914 (1977); *Johnson v. St. Vincent Hospital, Inc.*, 404 N.E.2d 585, 600 (Ind. 1980). Furthermore, none of the classifications created by RSA ch. 507-C (Supp. 1979) involves the type of suspect classification, such as race, alienage or nationality, that would require strict scrutiny. *See Johnson v. St. Vincent Hospital, Inc.*, *supra* at 596–97; *Estate of Cargill v. City of Rochester*, *supra* at 667, 406 A.2d at 707; *Belkner v. Preston*, *supra* at 18, 332 A.2d at 170–71.

■ ■ Although the right to recover for personal injuries is not a "fundamental right," *Estate of Cargill v. City of Rochester*, *supra* at 666, 406 A.2d at 707, it is nevertheless an important substantive

right. *Briscoe Co. v. Rutgers*, 130 N.J. Super. 493, 500, 327 A.2d 687, 690 (1974); *Hunter v. North Mason School Dist.*, 85 Wash. 2d 810, 814, 539 P.2d 845, 848 (1975). In *Estate of Cargill v. City of Rochester, supra* at 667, 406 A.2d at 707, we applied the rational basis test in evaluating classifications which, like those in RSA ch. 507-C (Supp. 1979), place restrictions on an individual's right to recover in tort. We now conclude, however, that the rights involved herein are sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test. *See Hunter v. North Mason School Dist., supra* at 814, 539 P.2d at 848. Consequently, the classifications created by RSA ch. 507-C (Supp. 1979) "must be reasonable, not arbitrary, *and* must rest upon some ground of difference having a fair and substantial relation to the object of the legislation" in order to satisfy State equal protection guarantees. (Emphasis added.) *State v. Scoville*, 113 N.H. 161, 163, 304 A.2d 366, 369 (1973), *quoting F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920); *see Allen v. Manchester*, 99 N.H. 388, 390–91, 111 A.2d 817, 819 (1955); *State v. Moore*, 91 N.H. 16, 22, 13 A.2d 143, 148 (1940).

We recognize that recently the United States Supreme Court has restricted its application of this substantial relationship test to cases involving classifications based upon gender and illegitimacy. *See, e.g., Lalli v. Lalli*, 439 U.S. 259, 265 (1979) (illegitimacy); *Reed v. Reed*, 404 U.S. 71, 76–77 (1971) (gender). In interpreting our State Constitution, however, we are not confined to federal constitutional standards and are free to grant individuals more rights than the Federal Constitution requires. *Opinion of the Justices*, 118 N.H. 347, 349–50, 387 A.2d 333, 335 (1978); *Angwin v. Manchester*, 118 N.H. 336, 337, 386 A.2d 1272, 1273 (1978); *see State v. Hogg*, 118 N.H. 262, 264, 385 A.2d 844, 845 (1978); *State v. Phinney*, 117 N.H. 145, 146, 370 A.2d 1153, 1153 (1977). Indeed, we, have applied the "fair and substantial relation" test not only in scrutinizing gender-based classifications, *see Allen v. Manchester, supra* at 390–91, 111 A.2d at 819, but also in examining economic and social legislation and ordinances which did not involve distinctions based upon gender or illegitimacy. *See Opinion of the Justices*, 113 N.H. 205, 213, 304 A.2d 881, 887 (1973); *State v. Moore, supra* at 21–22, 13 A.2d at 147–48.

■■ We therefore hold that, in determining whether RSA ch. 507-C (Supp. 1979) denies medical malpractice victims equal protection of the laws, the test is whether the challenged classifications are reasonable and have a fair and substantial

relation to the object of the legislation. *Accord, Jones v. State Board of Medicine*, 555 P.2d at 411; *Johnson v. St. Vincent Hospital, Inc.*, 404 N.E.2d at 600; *Arneson v. Olson*, 270 N.W.2d 125, 133 (N.D. 1978). Whether the malpractice statute can be justified as a reasonable measure in furtherance of the public interest depends upon whether the restriction of private rights sought to be imposed is not so serious that it outweighs the benefits sought to be conferred upon the general public. *Donnelly v. Manchester*, 111 N.H. 50, 51, 274 A.2d 789, 791 (1971); *Allen v. Manchester, supra* at 392, 111 A.2d at 820; *Woolf v. Fuller*, 87 N.H. 64, 68–69, 174 A. 193, 196 (1934).

In applying this equal protection test, however, we will not independently examine the factual basis for the legislative justification for the statute. In the absence of a "suspect classification" or a "fundamental right," courts will not second-guess the legislature as to the wisdom of or necessity for legislation. *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *cf. Opinion of the Justices*, 113 N.H. at 209, 304 A.2d at 884. Our sole inquiry is whether the legislature could reasonably conceive to be true the facts on which the challenged legislative classifications are based. *Vance v. Bradley*, 440 U.S. 93, 111 (1979); *Allen v. Manchester*, 99 N.H. at 391, 111 A.2d at 819; *State v. Moore*, 91 N.H. at 22, 13 A.2d at 148. The legislature had before it facts from which it could reasonably conclude that there had been substantial increases in the size and incidence of medical malpractice claims, which in turn posed a threat to the continued effective delivery of health care at a reasonable cost in the State. From these facts the legislature could also conclude that these problems required special legislative treatment. Whether we would have come to the same conclusion is not material, for

> "[i]t makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety."

*Vance v. Bradley, supra* at 112, *quoting Rast v. Van Deman & Lewis Co.*, 240 U.S. 342, 357 (1916).

With this analytical framework in mind, we turn to our examination of those provisions of RSA ch. 507-C (Supp. 1979) which the plaintiffs assert deny them equal protection of the laws. The only issues we address are whether the statute has a fair and substantial relation to this legitimate legislative objective and whether it imposes unreasonable restrictions on private rights.

II. *Expert Testimony*

The plaintiffs first challenge the constitutionality of RSA 507-C:3 (Supp. 1979) which sets forth the standards for qualified expert testimony in medical malpractice actions. Under RSA 507-C:3 I (Supp. 1979), a witness is not competent to give expert testimony unless "the court finds that the witness was competent and duly qualified to render or supervise equivalent care to that which is alleged to have caused the injury, at the time that such care was rendered." The plaintiff must present expert testimony in order to satisfy his burden of proof under RSA 507-C:2 (Supp. 1979). RSA 507-C:3 III (Supp. 1979) permits a defendant medical care provider, in certain circumstances, to refuse to give expert opinion testimony against himself.

RSA 507-C:3 I (Supp. 1979) is designed to ensure that the trier of fact's decision is based upon testimony that is, in fact, expert as to the medical treatment or procedure and not upon the testimony of persons who simply have more medical knowledge than the average layman and are not competent to testify as to the quality of the medical care at issue. This provision will tend to eliminate illegitimate malpractice claims and will presumably ensure that damage awards accurately reflect the actual damage suffered. Thus, the requirement that an expert witness be competent to testify is reasonable and has a fair and substantial relationship to the legislative objective of containing the costs of public health care and medical malpractice insurance. Moreover, this provision is in accord with the rule that, in the area of medical malpractice, matters relating to the relevant standard of care, failure to comply with such standard, and proximate cause must generally be established by expert testimony. *See, e.g., Murphy v. Dyer*, 409 F.2d 747 (10th Cir. 1969); *Murray v. Industrial Commission*, 87 Ariz. 190, 349 P.2d 627 (1960); *Folger v. Corbett*, 118 N.H. 737, 394 A.2d 63 (1978). As such, it is reasonable to require that the expert witness be or have been a person competent to render or supervise equivalent care. *April v. Peront*, 88 N.H. 309, 311, 188 A. 457, 459 (1936). To the extent, however, that the words "duly qualified" refer to anything other than competence, we find that such a requirement bears no reasonable relationship to the stated purpose and is therefore invalid.

Also, the requirement that the witness be an expert in the field *at the time* the defendant rendered the alleged negligent care does not substantially further these objectives and places too burdensome a restriction on medical malpractice claimants who

require expert testimony to prove their cause of action. This requirement is therefore invalid. Whether the time at which a witness was competent to render or supervise equivalent care was so remote from the time of the alleged malpractice as to disqualify him from giving expert testimony is a matter within the trial court's discretion. *See Wiggin v. Kent McCray Co.*, 109 N.H. 342, 347, 252 A.2d 418, 422 (1969); *Paisner v. Renaud*, 102 N.H. 27, 31, 149 A.2d 867, 871 (1959).

We find nothing objectionable in the legislature's decision to grant a medical malpractice defendant the privilege not to give expert opinion testimony against himself. RSA 507-C:3 III (Supp. 1979). If a plaintiff's claim is a legitimate one, he should be able to find somewhere in or out of the State at least one qualified expert witness who will testify for him. Moreover, this provision does not unduly restrict the rights of malpractice plaintiffs. As we construe it, it does not prevent the plaintiff from requiring the defendant to testify regarding factual issues but only prevents him from requiring the defendant to give his expert *opinion* on matters such as the relevant standard of care and proximate cause. Furthermore, the privilege not to testify is lost if the defendant voluntarily gives expert opinion testimony favorable to himself.

III. *Statute of Limitations*

The plaintiffs next challenge the constitutionality of the statute of limitations for medical injury actions, although they do not specify the alleged constitutional infirmity. RSA 507-C:4 (Supp. 1979) requires that a medical malpractice plaintiff bring his action within two years of the alleged negligence or, if the "action is based upon the discovery of a foreign object in the body of the injured person which is not discovered and could not reasonably have been discovered within such 2 year period, the action may be commenced within 2 years of the date of discovery or of the date of discovery of facts which would reasonably lead to discovery, whichever is earlier." The statute also provides that a child less than eight years old at the time of the alleged negligence shall have until his tenth birthday to commence an action for medical injury. Prior to the enactment of RSA ch. 507-C (Supp. 1979), a six-year limitation period applied to malpractice actions and to most other personal actions. RSA 508:4 (Supp. 1979).

We have previously discussed the applicability of the statute of limitations provisions of RSA ch. 507-C (Supp. 1979). *See Chodakowski v. Piper*, 120 N.H. 330, 414 A.2d 1295 (1980). We wish to state at the outset that our decision today has no effect on the holding in *Chodakowski*.

RSA 507-C:4 (Supp. 1979) is invalid insofar as it makes the discovery rule unavailable to all medical malpractice plaintiffs except those whose actions are based upon the discovery of a foreign object in the injured person's body. Under the discovery rule a cause of action does not accrue until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered both the fact of his injury and the cause thereof. *Raymond v. Eli Lilly & Co.*, 117 N.H. 164, 171, 371 A.2d 170, 174 (1977); *see United States v. Kubrick*, 444 U.S. 111, 118–25 (1979). The rule is premised on "the manifest unfairness of foreclosing an injured person's cause of action before he has had even a reasonable opportunity to discover its existence." *Brown v. Mary Hitchcock Memorial Hosp.*, 117 N.H 739, 741–42, 378 A.2d 1138, 1139–40 (1977). Although the discovery rule was initially employed in this State in a "foreign-object" case, *Shillady v. Elliot Community Hosp.*, 114 N.H. 321, 320 A.2d 637 (1974), we made it clear in *Brown v. Mary Hitchcock Memorial Hosp.* that the rule and the fundamental equitable considerations underlying it applied to medical malpractice cases generally. 117 N.H. at 741, 378 A.2d at 1139. As such, the legislature may not abolish the discovery rule with respect to any one class of medical malpractice plaintiffs. We therefore hold that in *all* medical malpractice cases in which the cause of action is not discovered and could not reasonably be discovered during the applicable limitation period, that period will not begin to run until the time the plaintiff discovers both his injury and its cause. Since the issue is not before us, we do not consider whether *Brown* went too far in extending the discovery rule beyond discovery of the existence and cause of the injury to discovery of negligence on the defendant's part. *See United States v. Kubrick supra.*

We also find that RSA 507-C:4 (Supp. 1979) is unconstitutional insofar as it extinguishes rights conferred by RSA 508:8, which provides: "An infant or mentally incompetent person may bring a personal action within two years after such disability is removed." RSA 508:8 is a saving statute, the purpose of which is to protect minors and mental incompetents from the destruction of their rights by the running of the statute of limitations. *Williams v. Los Angeles Metropolitan Transit Authority*, 68 Cal. Rptr. 297, 299, 440 P.2d 497, 499 (1968); *Roe v. Doe*, 287 N.Y.S.2d 292, 298 (Fam. Ct. 1968). The legislature may not, consistent with equal protection principles, deny only this class of medical malpractice plaintiffs the protection afforded all other persons by the saving statute. *See generally* Note, *The Indiana Medical Malpractice Act:*

*Legislative Surgery on Patients' Rights*, 10 VAL. L. REV. 303, 338–50 (1976). In doing so, RSA 507-C:4 (Supp. 1979) does not substantially further the legislative object of containing the costs of the medical injury reparations system because the number of malpractice claims brought by or on behalf of minors or mental incompetents is comparatively small. *See* Jenkins, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge*, 52 S. CAL. L. REV. 829, 960–61 (1979). At the same time, the statute operates to extinguish a cause of action of which the plaintiff, due to his disability, may not have learned until after the limitations period has expired. The last sentence of RSA 507-C:4 (Supp. 1979) unfairly burdens and discriminates against medical malpractice plaintiffs, and we therefore hold that it denies such plaintiffs equal protection of the laws.

IV. *Notice Compliance*

We next turn to RSA 507-C:5 (Supp. 1979), which provides that no action for medical injury shall be commenced until at least sixty days after service upon the defendant, by registered or certified mail, of a written notice of claim setting forth, under oath, the nature and circumstances of the alleged injuries and the damages claimed. This provision clearly conditions the filing of suit upon the notice of claim. *See Burdett v. Methodist Hospital*, 484 F. Supp. 1338, 1341 (N.D. Tex. 1980) (commenting on RSA 507-C:5 (Supp. 1979)). The plaintiffs contend that this notice requirement is unreasonable and denies them equal protection of the laws. We agree.

The legislative history indicates that the purpose of RSA 507-C:5 (Supp. 1979) is to provide the malpractice defendant with some sort of warning before the commencement of expensive litigation. This would give the defendant an opportunity to evaluate the claim and consider the possibility of settlement before costly litigation is undertaken.

This notice requirement does not, however, fairly and substantially relate to any legitimate legislative objective. The malpractice defendant gets all the notice he needs when he is served with process (RSA ch. 510 (Supp. 1979)), because he still has ample time to review the claim and initiate settlement negotiations before the trial begins. Any expenses incurred in doing so would likewise be incurred if the investigatory and settlement process was commenced prior to suit. Thus, the special treatment afforded medical care providers by the notice provision at issue bears no reasonable relationship to the stated purposes of

RSA ch. 507-C (Supp. 1979). *Cf. Reich v. State Highway Department*, 386 Mich. 617, 623, 194 N.W.2d 700, 702 (1972) (holding unconstitutional a 60-day notice requirement on plaintiffs suing State or local governmental authorities for negligence).

Furthermore, by placing numerous pitfalls in the path of unsuspecting plaintiffs, the effect of this notice requirement is to unjustly hinder the prosecution of many claims. The fact that three of the plaintiffs in these consolidated appeals had their suits dismissed for failure to strictly comply with RSA 507-C:5 (Supp. 1979), even though the trial court found that the defendants in fact had notice of the impending litigation, demonstrates that this section is a procedural trap for the unwary and not an effective means to encourage pretrial settlement or investigation. Of course, these plaintiffs may still institute a second suit to recover for their medical injuries, because a dismissal for failure to comply with a statutory notice requirement such as RSA 507-C:5 (Supp. 1979) is not a judgment on the merits, and initiation of a new suit on the same issues after compliance with the statute, therefore, is not barred by principles of *res judicata. Metropolitan Wash. Coal Cl. Air v. District of Columbia*, 373 F. Supp. 1089, 1092 (D.D.C. 1974), *rev'd on other grounds*, 511 F.2d 809 (D.C. Cir. 1975); *see York v. Sullivan*, 369 Mass. 157, 164–65, 338 N.E.2d 341, 347 (1975). Even if the limitations period prescribed by RSA 507-C:4 (Supp. 1979) has expired, the plaintiffs may still bring a new action if they do so within one year after the initial dismissal. RSA 508:10; *see Brady v. Duran*, 119 N.H. 467, 470, 403 A.2d 416, 418 (1979). Nevertheless, the notice requirement is a procedural hurdle which has the potential to prolong the time and increase the cost of medical malpractice litigation. Because of this, it unfairly postpones the time at which a malpractice victim may expect to recover for his injuries. Any conceivable public benefit conferred by RSA 507-C:5 (Supp. 1979) is outweighed by the restrictions it imposes on private rights. The statute is therefore unconstitutional and void.

The defendants cite one case in which the failure to comply with a notice requirement similar to RSA 507-C:5 (Supp. 1979) was held to bar suit. *Paradis v. Webber Hospital*, 409 A.2d 672 (Me. 1979). The defendants' reliance on *Paradis*, however, is misplaced because in that case the issue which the court addressed was whether the statute had been complied with and not whether the statute was constitutional. In no way does *Paradis* support the defendants' argument that RSA 507-C:5 (Supp. 1979) is constitutional.

V. *Damages*

The plaintiffs also challenge the constitutionality of RSA 507-C:7 (Supp. 1979), which governs the damages recoverable in an action for medical injury. RSA 507-C:7 I (Supp. 1979) provides that the defendant may introduce evidence of the plaintiff's compensation from collateral sources, that the plaintiff may then offer evidence of any costs incurred in securing such compensation, and that the jury shall be instructed to reduce the award for economic loss by a sum equal to the difference between the total benefits received and the total amount paid by the plaintiff to secure such benefits. RSA 507-C:7 II (Supp. 1979) limits awards for non-economic loss to $250,000. RSA 507-C:7 III (Supp. 1979) requires the jury to state separately its awards for past and future damages. It also provides that the jury shall not be informed of the limit for non-economic loss and that the court shall reduce any award which exceeds the limit to conform to the limit. RSA 507-C:7 IV (Supp. 1979) empowers the court, at the request of either party, to order that future damages exceeding $50,000 be paid by periodic payments on such terms as the court deems equitable. It also provides that in the event the injured person dies prior to completion of the installment payments, "upon motion of any party at interest the court shall modify the order by deducting from the remaining balance the amount thereof representing unpaid compensation for future non-economic loss and future expenses of care and by ordering the remainder to be paid to the estate of the decedent." RSA 507-C:7 IV (Supp. 1979).

The plaintiffs argue that RSA 507-C:7 I (Supp. 1979), by making the collateral source rule unavailable to a single class of tort claimants, unreasonably discriminates against them. Under the collateral source rule, a plaintiff is permitted to recover in full from the defendant tortfeasor even though he receives compensation from sources other than the defendant. *Moulton v. Groveton Papers Co.*, 114 N.H. 505, 509, 323 A.2d 906, 909 (1974). By abolishing the collateral source rule and thereby eliminating the "duplicate recovery" factor that exists in some cases where the rule is applied, the legislature sought to reduce malpractice awards and contain costs in the medical injury reparations system.

We first note that,

"[a]bolition of the [collateral source] rule . . . presents the anomalous result that an injured party's insurance company may be required to compensate the victim even though the negligent tortfeasor is fully insured. Not only does this abolition patently discriminate against the

victim's insurer, it may eventually result in an increased insurance burden on innocent parties."

Jenkins, 52 S. CAL. L. REV. at 948. Thus, although RSA 507-C:7 I (Supp. 1979) may result in lower malpractice insurance rates for health care providers, it may also increase the cost of insurance for members of the general public because they aré potential victims of medical negligence.

Furthermore, when the collateral benefits received by the malpractice plaintiff include workmen's compensation payments, RSA 507-C:7 I (Supp. 1979) will operate to prevent the plaintiff from recovering in full for his economic losses. This is so because RSA 281:14 I and II (Supp. 1979) give the workmen's compensation carrier a lien on any damages recovered by the plaintiff, less certain costs and expenses incurred by the plaintiff, up to the amount paid in compensation benefits. *Tarr v. Republic Corp.*, 116 N.H. 99, 102, 352 A.2d 708, 711 (1976); *Gagne v. Greenhouses*, 99 N.H. 292, 294, 109 A.2d 840, 841 (1954). The plaintiff-employee in a non-malpractice action, then, will not receive more or less than is necessary to make him whole nor will the defendant be obliged to pay more than that amount. *Moulton v. Groveton Papers Co.*, 114 N.H. at 510, 323 A.2d at 909-10; *Smith v. Am. Employers' Ins. Co.*, 102 N.H. 530, 534, 163 A.2d 564, 567 (1960). The malpractice plaintiff, however, will have the amount of compensation benefits deducted from his award for economic loss even though his collateral payor has a lien, to the extent of the compensation, on the amount of damages he recovers. The amount of compensation payments is, in effect, being deducted twice from the plaintiff's damage award.

Finally, although the collateral source rule operates so as to place some plaintiffs in a better financial position than before the alleged wrong, its abolition will result in a windfall to the defendant tortfeasor or the tortfeasor's insurer. Moreover, this windfall will sometimes be at the expense of the plaintiff, because "in many instances the plaintiff has paid for these [collateral] benefits in the form of . . . concessions in the wages he received because of such fringe benefits." *Moulton v. Groveton Papers Co.*, 114 N.H. at 509, 323 A.2d at 909. Thus, when the collateral payments represent employment benefits, the price for the public benefit derived from RSA 507-C:7 I (Supp. 1979) will be paid solely by medical malpractice plaintiffs.

The above considerations make it apparent that RSA 507-C:7 I (Supp. 1979) arbitrarily and unreasonably discriminates in favor of the class of health care providers. Although the statute

may promote the legislative objective of containing health care costs, the potential cost to the general public and the actual cost to many medical malpractice plaintiffs is simply too high. We therefore hold that RSA 507-C:7 I (Supp. 1979) violates the State's equal protection clauses. *Cf. Arneson v. Olson,* 270 N.W.2d at 137.

 The plaintiffs next challenge the constitutionality of RSA 507-C:7 II (Supp. 1979). The purpose of this section is to stabilize insurance risks and reduce malpractice insurance rates. It attempts to achieve this goal by providing that insurers will not have to pay out damages for "pain and suffering or other non-economic loss" in excess of $250,000. The plaintiffs contend that this provision denies them equal protection of the law, in that it creates an arbitrary damage limitation and thereby precludes only the most seriously injured victims of medical negligence from receiving full compensation for their injuries. We agree.

The New Hampshire damage limit is modeled after the California law that a lower court in that state has declared unconstitutional. *Lewis v. Glendale Adventist Hospital, et al.,* Cal., Los Angeles Superior Court, No. NC C 8018 G (Oct. 18, 1978), commented on in 22 ATLA L. R. 39 (1979). We find that the necessary relationship between the legislative goal of rate reduction and the means chosen to attain that goal is weak for two reasons:

> "First, paid-out damage awards constitute only a small part of total insurance premium costs. Second, and of primary importance, few individuals suffer noneconomic damages in excess of $250,000."

Jenkins, 52 S. CAL. L. REV. at 951.

It is also clear that the cap on damage recovery distinguishes not only between malpractice victims and victims of other torts but also "between malpractice victims with non-economic losses that exceed $250,000 and those with less egregious non-economic losses." Jenkins, 52 S. CAL. L. REV. at 951. We agree with the North Dakota Supreme Court that

> "the limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does nothing toward the elimination of nonmeritorious claims. Restrictions on recovery may encourage physicians to enter into practice and remain in practice, but do so only at the expense of claimants with meritorious claims."

*Arneson v. Olson*, 270 N.W.2d at 135–36. It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation. *Cf. American Bank & Trust v. Community Hospital*, 163 Cal. Rptr. at 521.

The defendants argue that the damage ceiling is saved because it applies only to non-economic loss and does not prevent the badly injured patient from recovering for all of his medical expenses and other economic loss. It is clear, however, that a tort victim "gains" nothing from the jury's award for economic loss, since that money replaces that which he has actually lost. It is only the award above the out-of-pocket loss that is available to compensate in some way for the pain, suffering, physical impairment or disfigurement that the victim must endure until death. In New Hampshire "pain and suffering is a very material element of damages in tort cases. . . ." *Duguay v. Gelinas*, 104 N.H. 182, 185, 182 A.2d 451, 453 (1962). We do not permit any formula or mathematical tool to be used in computing such damages. *Id.* If there is an excessive verdict, a remittitur is always available to control excessive jury awards. *See, e.g., Reid v. Spadone Mach. Co.*, 119 N.H. 457, 466, 404 A.2d 1094, 1099–1100 (1979) (reducing $150,000 award for loss of portion of three fingers to $125,000).

The defendants also contend that *Estate of Cargill v. City of Rochester*, 119 N.H. 661, 406 A.2d 704 (1979), compels the conclusion that the $250,000 damage limit is constitutional. In that case, a divided court reluctantly upheld a $50,000 statutory limitation on tort recovery for bodily injury against governmental subdivisions. *See* RSA 507-B:4 (Supp. 1979). In doing so, however, we noted that there had been no common-law right to sue a municipality, that a governmental tortfeasor was different from other tortfeasors, and that payment was guaranteed the tort victim under RSA 507-B:8 (Supp. 1979). *Id.* at 664, 666, 406 A.2d at 705, 706–07. RSA 507-C:7 II (Supp. 1979) is deficient on all three grounds.

The defendants' reliance on RSA 556:13, which limits recovery in actions for wrongful death, is likewise misplaced because such actions were unknown at common law and survive "only to the extent and in the manner provided by the legislature." *Hebert v. Hebert*, 120 N.H. 369, 370, 415 A.2d 679, 680 (1980). Furthermore, the statute does not limit recovery when the decedent is survived by "any relative dependent" on the deceased. Moreover, at least two other courts that have declared unconstitutional statutory limits on recovery in actions for medical malpractice have similarly distinguished such limits from those applicable to

wrongful death actions. *Wright v. Central DuPage Hosp. Ass'n*, 63 Ill. 2d 313, 324–28, 347 N.E.2d 736, 741–42 (1976); *Simon v. St. Elizabeth Medical Center*, 355 N.E.2d 903, 910 (Ohio App. 1976).

Finally, the New Hampshire Workmen's Compensation Act, RSA ch. 281, in no way supports the defendants' claim that the malpractice damage ceiling is constitutional, for the workmen's compensation law provides a *quid pro quo* for potential tort victims whose common law rights of action are supplanted by the statute. In this regard, the Illinois Supreme Court said:

> "Defendants argue that there is a societal *quid pro quo* in that the loss of recovery potential to some malpractice victims is offset by 'lower insurance premiums and lower medical care costs for all recipients of medical care.' This *quid pro quo* does not extend to the seriously injured medical malpractice victim and does not serve to bring the limited recovery provision within the rationale of the cases upholding the constitutionality of the Workmen's Compensation Act."

*Wright v. Central Du Page Hosp. Ass'n, supra* at 328, 347 N.E.2d at 742. This same analysis was utilized by the two dissenters in *Opinion of the Justices*, 113 N.H. at 215, 304 A.2d at 881, in rejecting a "no-fault" insurance bill that substantially altered the traditional tort reparation system in this State:

> "In our opinion, abolition of the rights of a class of persons injured in automobile accidents to recover damages for their injuries in full would contravene the plain language of article 14, part I of the New Hampshire constitution, *in the absence of provision of a satisfactory substitute;* and certainly recovery of only a limited portion of such damages cannot be equivalent to recovery of the damages in full. Society cannot escape its responsibility to provide justice by simply eliminating the rights of its citizens."

(Emphasis added.) (*Duncan* and *Grimes*, JJ., dissenting.) We have said enough to make it apparent that RSA 507-C:7 II (Supp. 1979) denies medical malpractice plaintiffs the equal protection of the law guaranteed them by the New Hampshire Constitution, and we so hold.

The plaintiffs next attack RSA 507-C:7 IV (Supp. 1979) on equal protection grounds. The provision allowing the court to order periodic payments in certain circumstances is apparently designed

to ensure that the claimant with substantial injuries requiring long-term treatment would have money available to pay for future medical care. *State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 510, 261 N.W.2d 434, 443 (1978). The purpose of the provision relating to payments following the death of the injured person is to reduce medical reparations system costs by eliminating a "bonus element," namely, the payment of portions of the award no longer required to compensate the malpractice victim.

Regardless whether the provision substantially furthers its stated purpose, we conclude that it unreasonably discriminates in favor of health care defendants and unduly burdens seriously injured malpractice plaintiffs. RSA 507-C:7 IV (Supp. 1979) makes no reference to interest payments for amounts withheld under the statute and we can only conclude that such payments are not contemplated. Thus, malpractice plaintiffs are prevented from obtaining lump sum judgments but are not able to accumulate interest on the unpaid portions of their awards. Moreover, although there may be a windfall to the claimant's family if the periodic payments are not terminated at the claimant's death, there is also a windfall benefit to the defendant's insurer under RSA 507-C:7 IV (Supp. 1979) if the claimant dies. *State ex rel. Strykowski v. Wilkie, supra* at 539–40, 261 N.W.2d at 457 (*Abrahamson*, J., dissenting). Furthermore, the money represented by the judgment becomes the plaintiff's property when he obtains a judgment. Yet he is denied the right to dispose of that property, as and when he pleases. In return he obtains only the questionable benefit of having money available to meet future expenses, which money, it may turn out, he does not even need. Finally, a statute which singles out seriously injured malpractice victims whose future damages exceed $50,000 and requires one class to shoulder the burden inherent in a periodic payments scheme from which the general public benefits offends basic notions of fairness and justice. *American Bank and Trust v. Community Hospital*, 163 Cal. Rptr. at 521. Accordingly, we hold that RSA 507-C:7 IV (Supp. 1979) is an unreasonable exercise of the legislature's police power and violates the State's equal protection guarantees.

## VI. *Attorneys' Fees*

Lastly, the plaintiffs question the constitutionality of RSA 507-C:8 (Supp. 1979), which establishes a contingent fee scale for attorneys representing parties in medical injury actions. The purpose of this provision is to assure that the malpractice victim receives the bulk of any award, thereby increasing the cost

effectiveness of awards to plaintiffs and of the medical reparations system as a whole.

The relationship between this provision and the overall purpose of RSA ch. 507-C (Supp. 1979)—the containment of medical injury reparations system costs—is questionable. There is no "direct evidence that juries consider attorneys' fees in coming to a verdict . . ." and "at least one study shows that juries do not include an assessment of the lawyer's contingency fee in their allotment of damages." Jenkins, 52 S. CAL. L. REV. at 943. Reapportionment of damage awards, therefore, is likely to have an insignificant effect on the size of awards, thereby doing little to reduce medical malpractice insurance rates or to control health care costs.

Moreover, RSA 507-C:8 (Supp. 1979) unfairly burdens malpractice plaintiffs and, to a lesser extent, their attorneys. The regulation of attorneys' fees solely in the area of medical malpractice inevitably will make such cases less attractive to the plaintiff bar. Consequently, RSA 507-C:8 (Supp. 1979) "will at least somewhat deter the litigation of legitimate causes of actions, thus creating a potential impediment to injured individuals' access to courts and counsel." Jenkins, *supra* at 944. This statute also unjustly discriminates by interfering with the freedom of contract between a single class of plaintiffs and their attorneys. It does not regulate contingency fees generally nor does it apply to defense counsel in medical malpractice cases, whose fees consume approximately the same percentage of the insurance premium dollar as do those of the plaintiff bar. *Id.* at 943 n.687. We therefore hold that RSA 507-C:8 (Supp. 1979) is unconstitutional.

VII. *Severability*

We now turn to the plaintiffs' argument relating to the severability of RSA ch. 507-C (Supp. 1979). They assert that if we find that significant provisions of RSA ch. 507-C (Supp. 1979) are unconstitutional, then the remaining provisions of the statute are invalid as well.

In determining whether the valid provisions of a statute are severable from the invalid ones, we are to presume that the legislature intended "that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved." *Rosenblum v. Griffin*, 89 N.H. 314, 320, 197 A. 701, 705 (1938). We must also determine, however, whether the unconstitutional provisions of the statute are "so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the structure." *Opinion of the Justices*, 88 N.H. 484, 491, 190 A. 425, 430 (1937).

The legislature in enacting RSA ch. 507-C (Supp. 1979) intended to create an entirely new comprehensive system of recovery in the field of medical negligence. A number of important provisions of the medical malpractice act are unconstitutional and we are not sure that the remaining provisions of RSA ch. 507-C (Supp. 1979) would have been enacted without the rest. *See Arneson v. Olson*, 270 N.W.2d at 138. We therefore hold that the valid provisions of RSA ch. 507-C are not separable from the remainder of the statute and declare the chapter void. *Accord, Arneson v. Olson supra.*

Accordingly, we reverse and remand Nos. 80-017, 80-099, 80-136 and 80-191 for proceedings consistent with this opinion; we remand Nos. 80-252, 80-273 and 80-291 for proceedings consistent with this opinion.

*Reversed and remanded.*