573 A.2d 853

**Richard Andre EDMONDS, et al.**

v.

**Sarah MURPHY, et vir.**

**No. 1480, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 30, 1990.

Robert P. O'Brien (Marc K. Sloane and Niles, Barton & Wilmer, on the brief), Baltimore, for appellants.

Philip O. Foard (George W. White, Jr., Jay D. Miller and White, Mindel, Clarke, & Foard, on the brief), Towson, for appellees.

J. Joseph Curran, Jr., Atty. Gen., Kathryn M. Rowe and Robert A. Zarnoch, Asst. Attys. Gen., Annapolis, for amicus curiae, State of Md.

David M. Funk, Bryan D. Bolton, Valerie A. Irvine and Shapiro and Olander, Baltimore, and Stephen P. Carney, Hunt Valley, for amicus curiae, Medical Mut. Liability Ins. Soc. of Maryland.

**138**

Paul D. Bekman, Scott R. Scherr, Baltimore, and John J. Sellinger, Rockville, for amicus curiae, Maryland Trial Lawyers Ass'n and Russ M. Herman, New Orleans, Louisiana, for amicus curiae, Ass'n of Trial Lawyers of America.

H. Thomas Howell, Alan N. Gamse, Kathleen Howard Meredith, Scott D. Goetsch and Semmes, Bowen & Semmes, Baltimore, for amicus curiae, The Nat. Ass'n of Independent Insurers and The Maryland Ass'n of Defense Trial Counsel.

Michael T. Wharton, David A. Roling and Wharton, Levin & Ehrmantraut, Annapolis, for amicus curiae, The Product Liability Advisory Council, Inc. and the Motor Vehicle Mfrs. Ass'n of the U.S., Inc.

Argued before GARRITY, ALPERT and CATHELL, JJ.

ALPERT, Judge.

The "cap" on damages in personal injury cases [1] has been the subject of much controversy and debate within and without the legal profession. One recent law review article even suggests that we "blast the cap" that limits recovery of noneconomic damages in personal injury actions.[2] As shall be seen, we choose not to follow that suggestion. While the centerpiece of our decision in this case is the constitutionality of the cap, there also are other important issues that we must address. We begin with a brief summary of the incident that precipitated this action and an overview of the case's procedural history. We will add other factual details as they become necessary for our discussion of the issues.

---

1. The "cap," Md.Cts. & Jud.Proc.Code Ann. § 11–108(b), limits recovery of noneconomic damages to $350,000.

2. Comment, *Blasting the Cap: Constitutional Issues Arising From Maryland's Limitation of Noneconomic Damages in Personal Injury Claims,* 16 U.Balt.L.Rev. 327 (1987).

Shortly after noon on a clear December day in 1987, Richard Edmonds was driving north on Interstate 83 in Baltimore County in a tractor trailer owned by his employer, Port East Transfer Company (Port East). The road surface was dry and visibility was good. Suddenly, the truck's left front tire exploded, causing Edmonds to lose control of the vehicle. The truck, which had been in the center lane, crossed over the left lane northbound, the grass median, and the three southbound lanes before colliding with an embankment on the southbound side of the highway. Sarah Murphy was driving in one of the southbound lanes when her car collided with Edmonds's truck. Ms. Murphy suffered serious physical injuries.

Sarah Murphy and her husband, Clark Murphy, Jr. (appellees), filed suit against Edmonds and Port East (appellants) in the Circuit Court for Baltimore County alleging gross negligence and negligence, and seeking compensatory and punitive damages. A jury trial was conducted in the Circuit Court for Baltimore County (Judge Joseph F. Murphy, Jr., presiding) in August 1989. At the trial, the Murphys presented evidence that, *inter alia:* (1) Edmonds was late for a delivery in Harrisburg; (2) the tire blew out because it had been improperly repaired; (3) before the accident, the tire had two visible holes; and (4) Edmonds dove to the floor of the truck because he feared for his life. The jury returned a verdict awarding compensatory damages against both appellants in the total amount of $797,165.31, of which $510,000 were awarded for pain and suffering. The jury also awarded punitive damages of $3,000 against Edmonds and punitive damages of $1,000,000 against Port East.

Appellants filed a motion requesting that the trial court apply § 11–108(b) to the noneconomic damages awarded to the Murphys, as well as a motion for remittitur or, in the alternative, for a new trial, pursuant to Md. Rule 2–533. Judge Murphy denied both motions. He refused to apply the cap because he concluded that it violated equal protec-

tion provisions.[3] Judgment was entered on the jury's verdict on September 19, 1989. Appellants filed this appeal two days later and assert that:

I. The trial court erred in holding that the cap statute was unconstitutional.

II. The trial court erred in holding that the award for loss of homemaker services was not includable within the cap.

III. The plaintiffs failed to present evidence sufficient to justify an award of compensatory damages against either defendant.

IV. The plaintiffs failed to present evidence sufficient to justify an award of punitive damages against either defendant.

V. The lower court erred in failing to instruct the jury on the doctrine of sudden emergency.

VI. The lower court erred in failing to instruct the jury regarding the plaintiffs' burden to establish notice of the defect.

VII. The trial court erred in denying the defendants' motion for new trial or in the alternative remittitur on the issue of punitive damages.

## I. THE CAP

The cap statute, Md.Cts. & Jud.Proc.Code Ann. § 11–108(b), requires that a trial judge in a personal injury action reduce any jury verdict for noneconomic damages that exceeds $350,000.[4] Noneconomic damages are defined

---

**3.** As we discuss *infra,* it seems clear that the trial judge found the statute violative of the Maryland equal protection provision, rather than the fourteenth amendment of the federal constitution.

**4.** Section 11–108 provides in pertinent part:

§ 11–108. **Personal injury action—Limitation on noneconomic damages.**

(a) *Noneconomic damages.*—In this section:

as pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury, but does not include punitive damages. *Id.* at § 11–108(a). In the instant case, Judge Murphy ruled that the cap was unconstitutional under an equal protection analysis, and therefore refused to reduce the jury's $510,-000 award for pain and suffering to $350,000. In so ruling, Judge Murphy chose not to address other constitutional attacks that appellees mounted on the cap. Nevertheless, we shall address them.

### A. *Presumption of Constitutionality*

■ At the outset of our discussion of the cap's constitutionality, we note that "statutes are generally presumed to be constitutional, . . . they should not be declared otherwise unless the repugnancy is clear, and . . . courts should avoid declaring a statute invalid if there is some less drastic way of deciding the case." *Miller v. Maloney Concrete Co.*, 63 Md.App. 38, 46–47, 491 A.2d 1218 (1985). As the court in *Sun Oil Co. v. Goldstein*, 453 F.Supp. 787, 791 (D.Md.1978) noted, "[T]he presumption of constitutionality attaches to the enactment of every statute. The burden is on plaintiff to overcome this presumption." Thus, appellees in the case before us were required to overcome a strong presumption that the cap was constitutional.

---

(1) "Noneconomic damages" means pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

(2) "Noneconomic damages" does not include punitive damages.

(b) *Limitation of $350,000 established.*—In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

. . . .

(d) *Jury trials.*—(1) In a jury trial, the jury may not be informed of the limitation established under subsection (b) of this section.

(2) If the jury awards an amount for noneconomic damages that exceeds the limitation established under subsection (b) of this section, the court shall reduce the amount to conform to the limitation.

## B. *Right to Jury Trial*

On the subject of the right to a jury trial, we note that "[a]s of yet, the Seventh Amendment *per se* has not been applied to proceedings in state courts. Thus, we need only examine the statute's constitutional muster under the analogous state constitutional provision." *Potomac Electric Power Co. v. Smith,* 79 Md.App. 591, 626 n. 20, 558 A.2d 768 *cert. denied,* 317 Md. 393, 564 A.2d 407 (1989) (citations omitted).[5] The Maryland right to jury trial provision is Article 23 of the Declaration of Rights, which states in pertinent part that:

> The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of five hundred dollars, shall be inviolably preserved.

Appellees contend that the cap, requiring noneconomic damages to be stricken if they exceed $350,000, "interferes with [Ms. Murphy's] fundamental right to have the issue fully determined by a judgment of her peers under Article 23." In support of their argument, the Murphys cite *Chauffers, Teamsters and Helpers, Local 391 v. Terry,* —— U.S. ——, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), in which the Supreme Court stated that:

> Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.

*Id.* at ——, 110 S.Ct. at 1344–45, 108 L.Ed.2d at 528 (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 501, 79 S.Ct. 948, 952, 3 L.Ed.2d 988 (1959)).

We addressed the constitutionality of § 11–108(b) under Article 23 last year in *Potomac Electric, supra.* In that case, the personal representative of the estate of an adoles-

---

**5.** Appellees conceded in their Memorandum in Response to Defendant's Motion to Impose Cap on Jury Verdict that "the Federal Constitution would not guarantee a right to trial by jury in this case."

cent killed when she came into contact with the power company's high voltage line brought a wrongful death action against the power company pursuant to Maryland's wrongful death statute, Md.Cts. & Jud.Proc.Code Ann. §§ 3–901 to 904. We noted that wrongful death beneficiaries had only been permitted to recover for noneconomic damages under the statute since 1969. We held that § 11–108(b) did not violate Article 23 as it pertained to wrongful death actions, saying:

> The General Assembly would be well within its authority to abolish wrongful death actions if it chose to do so. Certainly, it would be well within its authority to repeal the 1969 statute permitting recovery for noneconomic loss in wrongful death actions. Within its powers to create a cause of action or abolish a statutory cause of action is the power to modify such statutory actions. Limitation of the jury's determination of damages in a statutorily-created cause of action is a proper modification of the remedy available in such actions and does not violate Article 23 of Maryland's Declaration of Rights.

*Potomac Electric,* 79 Md. at 628, 558 A.2d 768. We specifically declined to decide, however, whether the cap violates Article 23 when applied to common law actions for personal injuries such as the one before us now.

In *Franklin v. Mazda Motor Corp.,* 704 F.Supp. 1325 (D.Md.1989), U.S. District Court Judge Paul Niemeyer concluded that the cap did not violate the seventh amendment or Article 23, opining that

> [A] legislature adopting a prospective rule of law that limits all claims for pain and suffering in all cases is not acting as a fact finder in a legal controversy. It is acting permissibly within its legislative powers that entitle it to create and repeal causes of action. The right of jury trials in cases at law is not impacted. Juries always find facts on a matrix of laws given to them by the legislature and by precedent, and it can hardly be argued that limitations imposed by law are a usurpation of the jury function. . . .

... [W]hen a legislative body, *without regard to facts of a particular case, dispute or incident,* but rather as a matter of policy and rule determines for all citizens in all incidents that may occur thereafter that recovery will be limited, the function is legislative, completely analogous to the adoption or repeal of causes of action and remedies therefor. Juries function as parts of the dispute resolution apparatus between parties; a legislature functions to make rules in advance of disputes to be applied to the disputes. The Court here can discern no blurring of the lines separating these functions in this case where Maryland adopted a prospective law limiting awards for pain and suffering.

The power of the legislature to define, augment, or even abolish complete causes of action must necessarily include the power to define by statute what damages may be recovered by a litigant with a particular cause of action....

*Id.* at 1331 (emphasis in original).

The Supreme Court of Virginia recently upheld a $750,000 cap on *all* damages arising out of medical malpractice actions against a number of constitutional challenges, including the right to a jury trial under the Virginia Constitution, in *Etheridge v. Medical Center Hospitals,* 237 Va. 87, 376 S.E.2d 525 (1989).[6] According to the *Etheridge* court,

Without question, the jury's factfinding function extends to the assessment of damages. Once the jury has ascertained the facts and assessed the damages, however, the constitutional mandate is satisfied. Thereafter, it is the duty of the court to apply the law to the facts.

The limitation on medical malpractice recoveries contained in [the cap] does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact. A trial court applies the remedy's limitation only *after* the

---

6. The Virginia legislature has raised the cap to $1,000,000 since the time of the malpractice in *Etheridge. Id.* 376 S.E.2d at 527 n. 1.

jury has fulfilled its fact-finding function. Thus, [the cap] does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process. *Id.* 376 S.E.2d at 529 (emphasis in original; citations omitted).

The Fourth Circuit also found the Virginia cap analyzed in *Etheridge* constitutional under the seventh amendment. *Boyd v. Bulala*, 877 F.2d 1191, 1196 (4th Cir.1989). A number of other courts have also upheld caps against right to jury trial challenges. *See Davis v. Omitowoju*, 883 F.2d 1155 (3rd Cir.1989) (Virgin Islands cap of $250,000 on nonmedical damages in medical malpractice actions); *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585 (1989) ($500,000 cap on all damages in medical malpractice actions); *Samsel v. Wheeler Transport Svcs.*, 244 Kan. 726, 771 P.2d 71 (1989) ($250,000 cap on pain and suffering damages in any action *except* medical malpractice suits did not violate right to trial by jury under state constitution).

Some courts, however, have held that their state's cap did violate the right to a jury trial. *See, e.g., Smith v. Department of Ins.*, 507 So.2d 1080 (Fla.1987) ($450,000 cap on noneconomic damages in tort actions does not provide injured person with constitutional benefit of jury trial); *Wright v. Central DuPage Hosp. Assoc.*, 63 Ill.2d 313, 347 N.E.2d 736 (1976) ($500,000 cap on recovery in medical malpractice actions violates right to jury trial under state constitution); *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988) (Kansas caps in medical malpractice actions of $1,000,000 for total recovery and $250,000 for noneconomic damages violate right to jury trial under state constitution); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711 (1989) (en banc), *modified,* 780 P.2d 260 (1989) (statute limiting, according to formula, noneconomic damages recoverable in personal injury or wrongful death actions violated right to jury trial under state constitution).

█ The logic and reasoning of *Franklin* and *Etheridge* is compelling. Thus, we hold that § 11–108(b) does not violate the right to a jury trial guaranteed by Article 23.

### C. *Article 19 and Due Process*

Article 19 of the Maryland Declaration of Rights provides:

> That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

The Association of Trial Lawyers of America (ATLA) and the Maryland Trial Lawyers Association (MTLA) [7] argue, as amicus curiae, that the $350,000 cap violates Article 19 in that it prevents seriously injured plaintiffs from fully redressing their injuries, without offering a viable *quid pro quo.*

ATLA raised a similar argument in *Potomac Electric, supra.* We noted in that case that "Article 19 provides 'the same due process of law required by the fourteenth amendment.' " *Id.* 79 Md.App. at 629, 558 A.2d 768. We went on to hold there that § 11–108(b) does not violate Article 19 as applied to wrongful death beneficiaries. *Id.* at 630, 558 A.2d 768. Our holding was strongly influenced by the fact that wrongful death beneficiaries were not entitled to recover any noneconomic damages at all when Article 19 was adopted in the mid–19th century. Because wrongful death beneficiaries today, even under the $350,000 cap, are entitled to a greater remedy than the wrongful death statute provided at the time Article 19 was adopted, we held that there was no Article 19 violation. *Id.* at 630, 558 A.2d 768 (citing *Hill v. Fitzgerald*, 304 Md. 689, 704–05, 501 A.2d 27 (1985)). As with the right to jury trial, we did not address

---

**7.** The two groups filed a single amicus brief. For the sake of clarity, we will refer to the groups collectively as "ATLA."

the right to a full remedy as it pertained to common law tort actions.

Judge Niemeyer did just that in *Franklin v. Mazda Motor Corp., supra,* and found that § 11–108(b) does not violate Article 19.[8] He pointed out that "a statutory limitation on recovery is a classic economic regulation and ... must be upheld if it is reasonably related to a valid legislative purpose." 704 F.Supp. at 1337 (citing *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 83, 98 S.Ct. 2620, 2636, 57 L.Ed.2d 595 (1977)). Continuing his due process analysis, Judge Niemeyer said,

> The cap certainly survives plaintiff's challenge under a reasonable basis analysis. Reducing uncertainty in damages awards and increasing the availability of insurance through reduced costs in Maryland surely are valid legislative goals. And the method chosen, that is by imposing an economic limitation on damages not otherwise measurable economically, is reasonably related to these goals.

*Franklin,* 704 F.Supp. at 1337.

The Supreme Court of Virginia in *Etheridge, supra,* and the Fourth Circuit in *Boyd, supra,* reasoned in a fashion somewhat similar to Judge Niemeyer's in upholding the Virginia cap on recovery in medical malpractice actions that we discussed in Part B. The *Etheridge* court said,

> The purpose of [the cap]—to maintain adequate health care services in this Commonwealth—bears a reasonable relation to the legislative cap—ensuring that health care providers can obtain affordable medical malpractice insurance. We hold, therefore, that substantive due process has not been violated.

376 S.E.2d at 531.

In holding that the Virginia cap did not violate the fourteenth amendment's guarantees of due process and equal protection, the Fourth Circuit said in *Boyd,*

---

8. The plaintiff in *Franklin* was injured when the car she was driving leaked hot water and antifreeze on her legs and feet. 704 F.Supp. at 1326–27.

[W]e agree with the conclusion of the Supreme Court of Virginia [in *Etheridge*] that the cap on liability bears a reasonable relation to a valid legislative purpose—the maintenance of adequate health care services in the Commonwealth of Virginia.

877 F.2d at 1197.

The majority of courts that have addressed caps under either a fourteenth amendment due process analysis or an analysis under state constitutional provisions similar to Article 19 have upheld the caps. *See Davis v. Omitowoju,* 883 F.2d 1155 (3rd Cir.1989) (Virgin Islands cap); [9] *Lucas v. United States,* 807 F.2d 414 (5th Cir.1986) (Texas cap on nonmedical damages in medical malpractice actions did not violate due process clause of fourteenth amendment); [10] *Johnson v. St. Vincent Hospital, Inc.,* 273 Ind. 374, 404 N.E.2d 585 (1980); *Samsel v. Wheeler Transport Svcs.,* 244 Kan. 726, 771 P.2d 71 (1989) (cap did not violate right to justice without delay guaranteed by state constitution); *Sibley v. Board of Supervisors,* 462 So.2d 149, *modified on reh'g,* 477 So.2d 1094 (La.1985) ($500,000 cap on recovery in medical malpractice actions did not violate due process under fourteenth amendment or right of access to courts guaranteed by state constitution). *Contra, Smith v. Department of Ins.,* 507 So.2d 1080 (Fla.1987) ($450,000 cap on noneconomic damages in all tort actions violates plaintiffs' right of access to courts under state constitution); *Lucas v. United States,* 757 S.W.2d 687 (Tex.1988) (*see* footnote 6, *supra* ).

■ We agree with the sound reasoning of the majority of courts that have analyzed caps under due process analy-

---

**9.** Most courts that have addressed constitutional challenges to caps, like *Davis,* have analyzed the caps under a number of different constitutional provisions.

**10.** *But see Lucas v. United States,* 757 S.W.2d 687 (Tex.1988), in which the Texas Supreme Court held in a related case that the same cap limited the plaintiff's right of access to the courts for a "remedy by due course of law," in violation of the Texas Constitution. *Id.* at 690.

ses or under constitutional provisions similar to Article 19 and found no constitutional violation. Accordingly, we hold that § 11–108(b) violates neither Article 19 nor the due process clause of the fourteenth amendment.

### D. *Separation of Powers*

ATLA also mentions in passing that § 11–108(b) violates the separation of powers doctrine in Article 8 of the Maryland Declaration of Rights.[11] That article states:

> That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

According to ATLA, the cap violates Article 8 in that it (and through the cap, presumably, the Legislature) interferes with the jury's function to determine the true amount of damages. We disagree. As Judge Niemeyer said in concluding that the cap does not violate Article 8,

> The power of the legislature to abolish the common law necessarily includes the power to set reasonable limits on recoverable damages in causes of action the legislature chooses to recognize. The Court therefore agrees with [the defendant] that if the legislature can, without violating separation of powers principles, establish statutes of limitations, establish statutes of repose, create presumptions, create new causes of action and abolish old ones, then it also can limit noneconomic damages without violating the separations of powers doctrine....

*Franklin,* 704 F.Supp. at 1336. The Supreme Court of Virginia in *Etheridge, supra,* held that that state's cap did not violate the Virginia Constitution's separation of powers

---

11. Appellee does not appear to make this same argument.

provision, which is very similar to Article 8.[12] According to the *Etheridge* court,

> [W]hether the remedy prescribed in [the Virginia cap] is viewed as a modification of the common law or as establishing the jurisdiction of the courts in specific cases, clearly it was a proper exercise of legislative power. Indeed, were a court to ignore the legislatively-determined remedy and enter an award in excess of the permitted amount, the court would invade the province of the legislature....

376 S.E.2d at 532.

ATLA cites us to no authority supporting its argument that § 11–108(b) violates Article 8, nor have we discovered any. Following the reasoning of *Franklin* and *Etheridge,* we hold that § 11–108(b) does not violate the separation of powers doctrine embodied in Article 8.

### E. *Equal Protection*

The final constitutional issue concerning § 11–108(b) is whether it violates equal protection principles. We begin our equal protection analysis by citing our discussion of the three "tiers" of equal protection in *Potomac Electric:*

> Traditionally, an equal protection analysis entailed a two-tiered approach. If the legislation infringed a fundamental right or involved a suspect classification, strict scrutiny was applied. The legislation would only survive where it was necessary to further a compelling governmental interest. If the legislation did not involve a suspect classification or a fundamental right, then a "rational basis" test was utilized. Under that test, the law would survive an equal protection analysis unless it was "wholly irrelevant to the achievement of the State's objective."
> *Attorney General v. Waldron,* 289 Md. 683, 707, 426

---

12. The Virginia separation of powers provision, Article III, § 1, states, in pertinent part, "The legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others...."

A.2d 929 (1981) (quoting *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)).

Recently, both the U.S. Supreme Court and the Court of Appeals of Maryland have haltingly gravitated towards adoption of a third trier to the equal protection analysis. This trier evolved from the rational basis analysis and has been referred to as "rationality that is not toothless." *Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). First adopted by the Court of Appeals in *Waldron, supra,* this "heightened scrutiny" test was most clearly articulated in *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983):

> "Heightened scrutiny" of a legislative classification is ... applied when a statute impacts upon "sensitive," although not necessarily suspect criteria of classification (*i.e.,* gender discrimination), or where a statute affects "important" personal rights or works a "significant" interference with liberty or a denial of a benefit vital to the individual. *Waldron, supra,* 289 Md. at 711 [426 A.2d 929]. A legislative classification, to withstand heightened scrutiny analysis, must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly situated and circumstanced will be treated alike. This level of review does not tolerate random speculation concerning possible justification for a challenged enactment; rather, it pursues the actual purpose of a statute and seriously examines the means chosen to effectuate that purpose. *Id.* at 713-14 [426 A.2d 929].

*Id.* at 641-42, 458 A.2d 758.

*Potomac Electric,* 79 Md.App. at 630-32, 558 A.2d 768. *See Clark v. Jeter,* 486 U.S. 456, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988) ("To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective.")

In concluding that § 11–108(b) is unconstitutional under an equal protection analysis, the learned trial judge first noted correctly that strict scrutiny does not apply to the cap. Appellees do not appear to argue that the right to receive an award of noneconomic damages in full is fundamental, or that personal injury victims whose noneconomic damages exceed the cap constitute a suspect class. According to Judge Murphy, however, the cap does infringe upon an "important right," which he termed "the right to press a claim for pain and suffering." He noted that such a right "was recognized at common law before the Maryland Constitution was adopted." The trial judge said the cap creates two classes of plaintiffs: those who are less severely injured and are entitled to keep everything the jury awards them, and those who are catastrophically injured and are not entitled to receive anything the jury awards them for noneconomic damages over $350,000. Because he found the right infringed upon to be an "important" one, Judge Murphy applied the heightened scrutiny test to the cap, ruling that the statute is unconstitutional.

█ It seems from the trial judge's opinion that he based his equal protection analysis on Article 24 of the Maryland Declaration of Rights,[13] rather than on the fourteenth amendment of the United States Constitution. Nevertheless, we will address the latter provision briefly because appellee and ATLA argue that § 11–108(b) violates equal protection principles under both constitutions. Citing the Supreme Court's use of the rational basis test in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1977),[14] and *San*

---

**13.** Maryland's Declaration of Rights contains no express equal protection mandate, but "such principles have been found to be implicit within the due process considerations of Article 24." *Potomac Electric,* 79 Md.App. at 630 n. 21, 558 A.2d 768 (citing *Attorney General v. Waldron, supra,* 289 Md. at 704, 426 A.2d 929).

**14.** In *Duke Power,* the Supreme Court utilized the rational basis test in upholding a federal law limiting to $560 million the damages recover-

*Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973),[15] and the use of the test by nearly every federal court examining the various state caps, we concluded in *Potomac Electric* that the rational basis test was the appropriate one for analyzing § 11–108(b) under the fourteenth amendment. 79 Md.App. at 632, 558 A.2d 768. Performing this "minimal scrutiny" test, we held that the cap does not violate the fourteenth amendment's equal protection clause. As we said in that case, "We believe that the General Assembly possessed a rational basis to believe that a liability insurance crisis existed and that the enactment of the cap was not arbitrary or unreasonable to alleviate the financial crisis it may have perceived." *Id.* at 633, 558 A.2d 768. We have not changed our view on this subject since we decided *Potomac Electric* last year. Thus, we hold that the cap does not violate the fourteenth amendment's equal protection provision.

As we pointed out in *Potomac Electric,* however, upholding the cap's constitutionality under the federal constitution does not necessarily resolve the equal protection issue under the state constitution:

> Although the equal protection clause of the fourteenth amendment and the equal protection principle embodied in Article 24 are "in pari materia," and decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other.

79 Md.App. at 633, 558 A.2d 768 (quoting *Attorney General v. Waldron, supra,* 289 Md. at 714, 426 A.2d 929). We noted, for example, that the Court of Appeals in *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. 597, 458 A.2d

---

able from a nuclear power plant operation in the event of a nuclear accident. 438 U.S. at 93, 98 S.Ct. at 2640.

**15.** In *Rodriguez,* the Supreme Court applied the rational basis test to a Texas statute that purportedly infringed upon one's right to education. 411 U.S. at 55, 93 S.Ct. at 1308.

758 (1983) "implicitly recognized that significant interference with the 'right to take advantage of a thorough and efficient education' would merit heightened scrutiny," despite the fact that the Supreme Court had applied only the rational basis test in analyzing the same right under the fourteenth amendment in *Rodriguez, supra.*[16]

 We begin our analysis of the cap under Article 24 by reiterating that the right involved here—the right to be compensated fully for noneconomic damages—is not a fundamental right and does not involve a suspect class. Thus, we will not apply strict scrutiny. In addition, we note that we already have determined that the Legislature had a rational basis for its classifications under the cap. Accordingly, we will uphold the statute under Article 24 as well if we determine that the rational basis test is the appropriate test.

The only question remaining is whether the statute should be analyzed under the rational basis test (under which we certainly will hold it constitutional under Article 24) or under the heightened scrutiny test (under which we might conclude that it violates Article 24). More specifically, because § 11–108(b) clearly does not impact upon any " 'sensitive,' although not necessarily suspect criteria of classification," such as gender discrimination, the question is whether the statute either affects an "important" personal right or "works a 'significant' interference with liberty or a denial of a benefit vital to the individual." *Potomac Electric,* 79 Md.App. at 631, 558 A.2d 768. The able and experienced trial judge based his ruling that the cap was unconstitutional on a finding that the right involved here is an "important" one. Appellees and ATLA agree, and neither appears to contend that a liberty was interfered with

---

**16.** The *Hornbeck* court applied the rational basis test, but it seemed to do so only because it found that the statute at issue did not interfere significantly with the right to education. *Potomac Electric,* 79 Md. App. at 633–34, 558 A.2d 768.

or a vital benefit was denied. Appellant and amici,[17] on the other hand, contend that the right to be fully compensated for noneconomic damages in a tort action is not an important right and that the appropriate test is thus the rational basis test.

As one noted constitutional scholar seems to imply, the Supreme Court has never articulated the criteria that make an interest "important." L. Tribe, *American Constitutional Law* 1611–12 (2d ed. 1988). The only appellate decision in Maryland to utilize the heightened scrutiny standard of review, *Attorney General v. Waldron*, 289 Md. 683, 426 A.2d 929 (1981), although somewhat instructive, is not dispositive. In that case the Court of Appeals struck down, on equal protection grounds, a statute that prevented certain retired judges from practicing law for compensation. The Court applied heightened scrutiny because it held that the "right to engage in a chosen calling, once all reasonable requirements established by the legislature for the protection of the health, safety and welfare of the citizens have been complied with," was an important personal right. *Id.* at 718, 728–29, 426 A.2d 929.

A number of courts have applied equal protection analyses to statutes that limit a plaintiff's recovery for all types of damages, both economic and noneconomic.[18] These

---

**17.** The following groups argued, as amici curiae, that § 11–108(b) is constitutional under equal protection analysis: the State of Maryland; Medical Mutual Liability Insurance Society of Maryland; the National Association of Independent Insurers and the Maryland Association of Defense Trial Counsel (in a joint brief); and the Product Liability Advisory Council, Inc. and the Motor Vehicle Manufacturers Association of the United States (in another joint brief).

**18.** *See Boyd v. Bulala*, 877 F.2d 1191 (4th Cir.1989) (Virginia statute limiting all damages in medical malpractice actions to $750,000 was constitutional); *Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 404 N.E.2d 585 (1980) (upholding statute limiting recovery in medical malpractice actions to $500,000 for all damages); *Sibley v. Board of Supervisors*, 462 So.2d 149, *modified on reh'g*, 477 So.2d 1094 (La. 1985) (upholding statute limiting recovery for all damages in medical malpractice actions to $500,000 did not violate federal equal protection provision under rational basis test; on rehearing, however, same

cases, however, do not aid our decision. We have found only five courts that have applied equal protection analyses to statutes limiting only noneconomic or nonmedical damages. Four of the courts held that the caps were constitutional.

In *Fein v. Permanente Medical Group*, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985), *appeal dismissed*, 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215 (1985), the California Supreme Court upheld, against an equal protection challenge, a statute limiting recovery on noneconomic damages to $250,000 in medical malpractice actions. In that case, the trial judge applied the cap to the jury's $500,000 award of noneconomic damages. The plaintiff appealed, arguing, *inter alia*, that the statute improperly discriminated within the class of medical malpractice victims by denying a "complete" recovery of damages only to those malpractice plaintiffs whose noneconomic damages exceeded $250,000. *Id.* 211 Cal.Rptr. at 385, 695 P.2d at 682. The high court applied the rational basis test. In a footnote, the court distinguished *Carson v. Maurer, infra*, by saying that in finding the New Hampshire statute violative of equal protective provisions, "the *Carson* court ... applied an 'intermediate scrutiny' standard of review that is inconsistent with the standard applicable in this state." *Id.* 211 Cal.Rptr. at 385 n. 19, 695 P.2d at 682 n. 19. It is clear from this comment that California does not recognize a

court remanded for trial court to apply newly created one-tier analysis to determine if cap violated state equal protection provision); *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977) (upholding statute limiting recovery in medical malpractice actions to $500,000 for all damages); *Ethridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989) (upholding same statute that Fourth Circuit upheld in *Boyd, supra* ). *But see Jones v. State Bd. of Medicine*, 97 Idaho 859, 555 P.2d 399 (1977), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) (remanding to lower court for determination whether statute limiting total recovery in medical malpractice actions to $300,000 was constitutional under heightened scrutiny test; on remand, trial court ruled that cap violated equal protection); *Arneson v. Olsen*, 270 N.W.2d 125, 136 (N.D.1978) ($300,000 cap on total recovery in medical malpractice actions violated equal protection provisions of both state constitution and fourteenth amendment).

"heightened scrutiny" standard, and the court therefore was not compelled to determine if the right to recover for noneconomic damages was an "important" right.

Analyzing the same California cap in *Hoffman v. United States,* 767 F.2d 1431 (9th Cir.1985), the Ninth Circuit held that it did not violate the equal protection clause of the fourteenth amendment. Following a bench trial, the federal district court judge determined that the cap violated "equal protection," [19] and entered a judgment including, *inter alia,* $1,000,000 for noneconomic damages. The Ninth Circuit first noted that the Supreme Court of California already had held in *Fein* that the statute did not violate the equal protection provision of the California constitution.

The *Hoffman* court then analyzed the cap under the fourteenth amendment. Unlike the state court, the federal court discussed the intermediate level of scrutiny, saying that the United States Supreme Court has applied heightened scrutiny "only to gender based classifications ... and to categorizations premised on legitimacy." *Id.* at 1435. The court seemed to rely heavily on an Eighth Circuit case [20] in which that court chose not to apply heightened scrutiny to a statute that placed a six-year statute of limitations on malpractice actions except when foreign bodies unintentionally left in the body cause injury or death "because the case involved none of the classifications to which the Supreme Court has applied an intermediate test (illegitimacy or gender)." *Hoffman,* 767 F.2d at 1436. The *Hoffman* court then stated,

> Finding that [the cap] does not involve any suspect or quasi-suspect classification, a fundamental right, or a classification requiring a heightened scrutiny, we conclude that the proper level of scrutiny is the rational basis test.

---

**19.** The trial judge did not state whether his holding was based on the federal constitution, the California constitution, or both. *Id.* at 1433 n. 1.

**20.** *Fitz v. Dolyak,* 712 F.2d 330 (8th Cir.1983).

*Id.* The court did not discuss whether a plaintiff's right to recover for pain and suffering constituted an "important" right.

In *Davis v. Omitowoju,* 883 F.2d 1155 (3rd Cir.1989), the court analyzed the Virgin Islands $250,000 cap on nonmedical damages in medical malpractice actions. The court did not mention the heightened scrutiny test. Its entire discussion of the appropriate level of scrutiny reads as follows:

> As the Fourth Circuit stated in disposing of both the due process and equal protection claims advanced in *Boyd v. Bulala,* 877 F.2d 1191 (4th Cir.1989),[21] "a limitation on a common law measure of recovery does not violate a fundamental right or create a suspect classification." Davis did not assert any fundamental right to an uncapped jury verdict, nor could she. Nor has Davis attempted to, nor could she, style herself and all malpractice claimants as a suspect class. Any claim that she asserts must therefore be reviewed under the rational basis test. *Id.* at 1196.

*Id.* at 1158.

The Fifth Circuit upheld the Texas cap on nonmedical damages against a fourteenth amendment equal protection challenge in *Lucas v. United States,* 807 F.2d 414 (5th Cir.1986).[22] Like the *Davis* court, the court in *Lucas* did not discuss the heightened scrutiny test, saying only that:

> Any federal equal protection argument fails under the tests established by the United States Supreme Court. The strict scrutiny standard, *see Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), is inapplicable because we have neither a suspect class nor a

---

**21.** *Boyd* analyzed a $750,000 cap on *all* damages in medical malpractice actions and thus is inapposite to the case before us.

**22.** The federal court certified the question of the statute's constitutionality under the Texas Constitution to the Texas Supreme Court. That court held that the cap was unreasonable and arbitrary and that it unconstitutionally limited the plaintiff's right of access to the courts under the state constitution. *Lucas v. United States,* 757 S.W.2d 687, 690 (Tex.1988).

fundamental right in issue. Under the rational basis test, *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), we find that there is a rational basis for § 11.02 and that the legislature enacted the statute in an attempt to accomplish a legitimate purpose. *See Chrysler Corp. v. Texas Motor Vehicle Commission*, 755 F.2d 1192, 1203 (5th Cir.1985).

*Id.* at 422.

The only court that has held that a cap on noneconomic damages violated equal protection provisions was the Supreme Court of New Hampshire in *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980). The *Carson* court was called upon to analyze the constitutionality of RSA ch. RSA 507–C (Supp.1979), in which

the legislature set forth rigorous standards for qualified expert testimony, created a two-year statute of limitations applicable to most medical malpractice actions, required that notice of intent to sue be given at least sixty days before commencing the action, prohibited the statement of the total damages claimed as an ad damnum or otherwise, abolished the collateral source rule, limited the amount of damages recoverable for non-economic loss to $250,000, empowered the court to order periodic payments of any future damages in excess of $50,000, and established a contingent fee scale for attorneys in medical malpractice actions.

424 A.2d at 829. According to that court,

Although the right to recover for personal injuries is not a "fundamental right," it is nevertheless an important substantive right. In *Estate of Cargill v. City of Rochester, supra*, 119 N.H. [661] at 667, 406 A.2d [704] at 707, we applied the rational basis test in evaluating classifications which, like those in RSA ch. 507 C (Supp.1979), place restrictions on an individual's right to recover in tort. We now conclude, however, that the rights involved herein are sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational

basis test. Consequently, the classifications created by RSA ch. RSA 507–C (Supp.1979) "must be reasonable, not arbitrary, *and* must rest upon some ground of difference having a fair and substantial relation to the object of the legislation" in order to satisfy State equal protection guarantees.

*Id.* 424 A.2d at 830–31 (citations omitted) (emphasis in *Carson*). The court went on to address each of the limitations within RSA ch. RSA 507–C (Supp.1979) individually. With regard to the $250,000 cap on noneconomic damages, RSA 507–C:7 II (Supp.1979), the court first pointed out that the New Hampshire limit was modeled after the California law that a lower court in that state had declared unconstitutional. *Carson,* 424 A.2d at 836. (*Fein v. Permanente Medical Group, supra,* upholding the California cap, was not decided until more than four years later.) The *Carson* court then held that the cap denied medical malpractice plaintiffs the equal protection of the law guaranteed by the state constitution. *Id.* 424 A.2d at 838. In reaching this holding, the court said,

> We find that the necessary relationship between the legislative goal of rate reduction and the means chosen to attain that goal is weak for two reasons:
>
> > "First, paid-out damage awards constitute only a small part of total insurance premium costs. Second, and of primary importance, few individuals suffer noneconomic damages in excess of $250,000."

*Id.* 424 A.2d at 836 (quoting Jenkins, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge,* 52 S.Cal.L.Rev. 829, 960–61 (1979)). While the *Carson* court chose to apply heightened scrutiny to the New Hampshire cap and the other limitations included in RSA ch. RSA 507–C (Supp.1979), it gave no explanation for why those "rights" were "sufficiently important" to merit intermediate scrutiny.

Thus, none of the above cases present us with guidelines for determining whether the right to recover for noneco-

nomic damages is an important personal right meriting heightened scrutiny. We thus decide the issue in a virtual vacuum.

In seeking an answer, we certainly acknowledge that an individual's unfortunate experience of pain and suffering is indeed "important" to the person who feels that pain. That personal importance, as significant as it may seem, does not elevate the right of full compensation to the same status as the right to pursue one's chosen profession as in *Waldron*. We believe that every person enjoys the natural right to be free of pain and suffering caused by the negligent or wilful act of another. But that important natural right is not ipso facto transmuted by nature or evolution of the common law into an "important" personal right within the scope of constitutional analysis. We are not faced here with a statute abolishing entirely the right to recover noneconomic damages. Instead, the cap limits the noneconomic recovery to $350,000, a significant amount of money. This amount is over and above the damages plaintiffs are awarded for economic loss, such as medical bills and lost earnings, which remain unlimited.

There is no total deprivation to the individual of the kinds of rights one would expect in a democratic society.[23] Additionally, unlike many "rights" at common law, the right to recover for pain and suffering is not of ancient origin and

---

**23.** One noted constitutional scholar, Lawrence Tribe, discussed a number of rights or interests which he says the Supreme Court has deemed "important." L. Tribe, *American Constitutional Law* 1610–12 (2d ed.1988). Among the cases Tribe cites are the following: *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (illegal alien children's interest in *some* education); *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1977) (interest of aliens in employment in the federal competitive civil service); *United States Dept. of Agric. v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) (interest of individuals in receiving food stamps); and *New Jersey Welfare Rights Org. v. Cahill,* 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973) (per curiam) (interest of individuals in receiving public assistance).

does not enjoy a long history.[24] Therefore, we shall not consider the right to full compensation for noneconomic damages as an important personal right such as to trigger heightened scrutiny.

■ Even if we considered the right to full recovery of noneconomic damages an important personal right, and thus chose to apply heightened scrutiny, we still would hold § 11–108(b) constitutional because we believe the classifications the statute creates are "reasonable, not arbitrary, and ... rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Potomac Electric, supra.* The "object" of § 11–108(b) is the increase in availability and affordability of liability insurance in Maryland.

The Legislature had before it a report by the Governor's Task Force to Study Liability Insurance, a group established in August 1985 "to develop ... recommendations to help ensure the availability of adequate liability insurance coverage at an affordable cost in the state." Report of the Governor's Task Force to Study Liability Insurance 2 (Dec. 1985). Following two and a half months of weekly meetings, the task force produced eight recommendations, the first of which was a cap of no more than $250,000 on

---

**24.** *See* O'Connell & Bailey, *The History of Pain & Suffering,* 1972 U.Ill.L. Forum 83. According to the authors, "at least up to 1763 not only is there no record of review of damages for pain and suffering as such, but there seems to be no mention of pain and suffering at all." *Id.* at 91. The authors then cite the *Squib* case, *Scott v. Shepard,* 95 Eng.Rep. 1124 (K.B.1773), in which the court noted that the "plaintiff underwent and suffered great and excrutiating pain and torment for a long time." As the authors of the article note,

Although it cannot be determined what precise portion, if any, was awarded to compensate him for his pain (the issue of damages was not appealed), the court's allusion to pain and suffering as an element of plaintiff's loss is clear.

O'Connell & Bailey at 92.

The authors also point out that, "as early at 1798, pain was apparently an element to be pleaded in personal injury actions," *id.* at 93, and that by the middle of the 19th century "recovery for pain and suffering had been too well established for the courts to question it." *Id.* at 94.

noneconomic damages. *Id.* at 10. According to the task force,

The ceiling on noneconomic damages will help contain awards within realistic limits, reduce the exposure of defendants to unlimited damages for pain and suffering, lead to more settlements, and enable insurance carriers to set more accurate rates because of greater predictability of the size of judgments. The limitation is designed to lend greater stability to the insurance market and make it more attractive to underwriters.

A substantial portion of the verdicts being returned in liability cases are for noneconomic losses. The translation of these losses into dollar amounts is an extremely subjective process as these claims are not easily amenable to accurate, or even approximate, monetary valuation. There is a common belief that these awards are the primary source of overly generous and arbitrary liability claim payments. They vary substantially from person to person, even when applied to similar cases or similar injuries, and can be fabricated with relative ease.

A cap on allowable pain and suffering awards will help reduce the incidents of unrealistically high liability jury awards, yet at the same time protect the right of the injured party to recover the full amount of economic losses, including all lost wages and medical expenses.

*Id.* at 10–11.

In July 1985, Governor Harry Hughes appointed the 28–member Joint Executive/Legislative Task Force on Medical Malpractice Insurance. Report of the Joint Executive/Legislature Task Force on Medical Malpractice Insurance 1 (Dec.1985). During its fifteen meetings, that group received presentations and reports from its members and heard oral testimony from many people representing the insurance industry, the health care field, and the legal system. *Id.* at iii. The joint task force noted that "[s]everity of awards ha[d] been cited as a primary factor causing escalating premiums." *Id.* at 26. One witness

indicated that states which have imposed a ceiling on health care practice awards, either on the total award or on noneconomic damages, have experienced a reduction in the severity of awards.

*Id.* at 28. According to the joint task force, "It has been estimated that a $250,000 ceiling on noneconomic damages would have a moderate impact on medical malpractice insurance premiums." *Id.* at 28–29. The group then went on to recommend, *inter alia,* that the Legislature impose a $250,-000 cap on noneconomic damages. *Id.* at 29.

The legislators also had before them a report by the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability, released in February 1986. That group consisted of representatives of ten federal agencies and the White House. The working group identified and discussed four problem areas, including "[t]he explosive growth in the damages awarded in tort lawsuits, particularly with regard to non-economic awards such as pain and suffering or punitive damages." Report of the Tort Policy Working Group at Introduction, p. 2. The group noted that "the increase in the number of tort lawsuits and the level of awarded damages (or settlements) in and of itself has an obvious inflating effect on insurance premiums." *Id.* at Chapter 2, p. 21. Among the working group's eight recommendations was a suggestion that noneconomic damages be limited to $100,000. *Id.* at Chapter 4, p. 8.

Based upon this legislative history, we have little difficulty concluding that the classifications created by § 11–108(b)—those plaintiffs who have been awarded noneconomic damages greater than $350,000, and those who have been awarded noneconomic damages less than $350,000—have a "fair and substantial relation to the object of the legislation"—increasing the availability and affordability of liability insurance. Thus, we hold that the subject legislation is constitutional on all fronts.

## II. THE CAP AND HOMEMAKER SERVICES

■ Appellants contend that "[t]he trial court erred in holding that the award for loss of homemaker's services was not includible within the cap." Judge Murphy, in pertinent part, instructed the jury as follows:

There is a separate claim ... presented in this case by Mr. and Mrs. Murphy for damages to their marital relationship which has resulted from the accident. So here you consider what effect the injuries Mrs. Murphy sustained in this accident have on the marital relationship. The items are set forth here. We've got loss of household services in the past, "future loss of household services," and then other corsortium damages. What we're talking about here is an amount you feel is fair and just compensation for the loss of society, affection, assistance, fellowship. These are the things that you put in "other consortium" damages. There is a total for compensatory damages to Mrs. Murphy, there is a total for the claim of Mr. and Mrs. Murphy.

Evidence had been presented to the jury that before the accident Ms. Murphy was a good housewife who did all the cooking, cleaning, and gardening, but that since the accident she was no longer capable of performing normal homemaker services. Those services ranged from polishing the family silver to pulling up weeds from the garden. Additionally, there was supportive expert medical testimony indicating that she would have "great trouble doing her housework."

Expert testimony was presented by each side as to the cost of hiring someone to perform, in the future, those household services that Ms. Murphy was no longer capable of performing. The Murphys' economist valued those services at $270,863, while appellants' expert estimated the value to be $162,517. As compensatory damages for the Murphys, the jury returned the following verdicts:

| | |
|---|---|
| (1) past loss of household services | $ 20,000 |
| (2) future loss of household services | $225,000 |
| (3) other consortium damages | $0 |
| Total of Items (1) through (3) | $245,000 |

· Appellants contend "[b]ecause the plaintiffs' claim was for loss of consortium and the statute [25] specifically includes loss of consortium within noneconomic damages, the plain meaning and language of the statute must be applied and the claim for loss of homemaker's services must be included within the cap." Appellees posit that the cost of hiring someone to perform those household services that Ms. Murphy can no longer perform, although possibly encompassed within the consortium claim, certainly cannot be construed as a "nonpecuniary" loss. They reason that the Maryland cases include certain types of economic loss within the definition of "consortium." They point out that the Court of Appeals in *Nicholson v. Blanchette*, 239 Md. 168, 184–85, 210 A.2d 732, 213 A.2d 71 (1965), approved the definition of consortium found in the first *Restatement of Torts* § 693, which included any reasonable expense incurred by the husband in providing medical treatment. Appellees further argue that if one were to follow appellants' theory to its logical conclusion, courts would be compelled to include the cost of plastic surgery required to correct disfigurement which of itself is a noneconomic loss.

Finally, in challenging appellants' rationale, appellees suggest that "the cost for special adaptations to home, auto, or workplace due to 'physical impairments' was not intended by the legislature to be considered a 'noneconomic damage,'" yet appellants would have us so rule.

While there is much wisdom in appellees' argument, it is obvious that final resolution of the issue is dependent upon legislative intent. While appellants would have us rely on the plain language of the statute alone, giving the words

---

**25.** Section 11–108(a)(1) provides that "noneconomic damages means pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury. . . ."

their ordinary and natural meaning, *see Carolina Freight Carriers v. Keane,* 311 Md. 335, 338, 534 A.2d 1337 (1988), we suggest that the term "consortium" may no longer possess the "ordinary and natural meaning" that it would appear to have at first glance. Initially, we observe that the "consortium" as designated in the statute is classified as but another "nonpecuniary injury." There no longer seems to be a universality of definition with respect to "loss of consortium." We explain.

The "consortium" rule at *Restatement (Second) of Torts* is somewhat different from its earlier counterpart quoted with approval by the Court of Appeals in *Nicholson, supra.* The later version provides in pertinent part:

(1) One who by reason of his tortious conduct is liable to one spouse for illness or other bodily harm is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse, including impairment of capacity for sexual intercourse, and for reasonable expense incurred by the second spouse in providing medical treatment.

(2) Unless it is not possible to do so, the action for loss of society and services is required to be joined with the action for illness or bodily harm, and recovery for loss of society and services is allowed only if the two actions are so joined.

*Restatement (Second) of Torts* § 693, at 495.

Comment (f), "Damages," provides in pertinent part:

The major element of damages in an action based on this Section is any loss or impairment of the other spouse's society, companionship, affection and sexual relations. These are not matters of economic loss susceptible of pecuniary proof, and their monetary value must be assessed by the jury....

The impaired spouse, in an action for bodily injury brought against the defendant, may recover for bodily harm and emotional distress, loss or impairment of earning capacity and reasonable medical and other expenses.

(See § 924). The action by the deprived spouse must therefore not include any of these items, directly or indirectly.... To avoid duplication, the deprived spouse can recover expenses for medical treatment of the impaired spouse only for those expenses that have been incurred solely by the deprived spouse.

*Id.* at 497.

The modern approach to "loss of consortium" is further explicated in a learned treatise, *Prosser and Keaton on Torts* (5th ed. 1984):

In addition to the claims recoverable by either spouse for loss of services and society, the husband was allowed to recover the cost of the wife's medical treatment. This rule was based on the legal obligations of the husband to provide medical attention for his wife and on the fact that the wife was likely to be dependent upon the husband for such attention. Considerable social change has taken place since this rule was first followed, and the contemporary decisions show no special fondness for it. If the wife has paid the medical bills, or has obligated her credit specifically to do so, or if the injury occurred before marriage, the wife will be permitted to recover her own medical expenses. Some courts have spoken, somewhat generally, about allowing the wife to recover when appropriate, or to recover for future medical, though not past. At least one court has said that equality of treatment requires that the wife always recover her own losses, and statutes in some states have been interpreted to reach the same result.

*Id.* at 933.

The cause of action for loss of consortium has been allowed for "loss of household and other services that are of such a character that they cannot be rendered by hired help and on which, by reason of their character, no market value can be placed" and "for loss of services that ... [have been performed] though they are of a type that can be rendered by hired help." 41 Am.Jur.2d, *Husband and Wife* § 449, at 378. Another similar yet slightly different defini-

tion is set forth in another learned treatise, 2 F. Harper, F. James and O. Gray, *The Law of Torts* § 8.9 (2d ed. 1986):

**Loss of spouse's consortium.** The common law recognized the husband's interest in his wife's health and companionship and allowed him to recover from a tortfeasor for the loss of her consortium. "The term 'consortium' is usually defined as encompassing the services of the wife ... and the variety of intangible relations which exist between spouses living together in marriage.... These intangible elements are generally described in terms of 'affection, society, companionship and sexual relations.' ... These intangibles have also been defined as the 'constellation of companionship, dependence, reliance, affection, sharing and aid which are legally recognizable, protected rights arising out of the civil contract of marriage.' " Any or all such items may be taken into consideration by the jury in assessing damages, and recovery includes not only damages for services, society, and sexual relations lost at the date of trial but the estimated future loss.

*Id.* at 550–51.

As Judge Adkins said for the court in *Carolina Freight Carriers:*

We should search for legislative intent, the purpose, aim, and policy of the legislation, by looking at the words of the statute, as "controlled by the context in which they appear," and as "read in the light of other external manifestations of that purpose."

311 Md. at 339, 534 A.2d 1337.

We note again that the legislature characterized "loss of consortium" as a "nonpecuniary loss." It seems that in this day and age "consortium" includes both pecuniary and nonpecuniary components which can be the subject of loss. It was obviously the goal of the legislature to place a limit or cap upon the nonpecuniary components of loss of consortium such as affection, society, companionship, and sexual relations, and those services that might not be rendered by hired help. This is exemplified by the authors of the

subject legislation placing a certain emphasis on the nature of the loss by distinguishing pecuniary from nonpecuniary loss. But given the implicit legislative recognition that the nonpecuniary loss (and not the pecuniary loss) would be subject to the cap, we hold that compensation for the damages proved under the joint claim [26] of Mr. and Mrs. Murphy for services which can, but need not necessarily, be performed by hired help, was not includable within the cap. They were awarded for those kinds of services that the jury found that Ms. Murphy could no longer perform. The trial judge did not err.

### III. & IV. LIABILITY: COMPENSATORY AND PUNITIVE DAMAGES

■ Appellants contend that appellees failed to present evidence at trial to justify an award of punitive damages. They assert that the evidence did not meet the stringent standard set by Maryland courts for imposing punitive damages in automobile tort cases. To award punitive damages in the absence of actual malice or intent, a defendant's conduct must constitute a wanton or reckless disregard for human life in the operation of a motor vehicle, with the

---

**26.** In *Deems v. Western & Maryland Railway,* 247 Md. 95, 115, 231 A.2d 514 (1966), the Court of Appeals held:
> When either husband or wife claims loss of consortium by reason of physical injuries sustained by the other as the result of the alleged negligence of the defendant, that claim can only be asserted in a joint action for injury to the marital relationship.

That is precisely how the Murphys filed their claim for "loss of consortium." In arriving at its decision, the Court of Appeals in *Deems* noted "there is in a continuing marital relationship, an inseparable mutuality of ties and obligations ... which makes that relationship a factual entity." Thus, the court saw no reason why the entity "concept" should not be extended to permit recovery for wrongs negligently caused to the legal unity through the physical injury of either spouse. This raises yet another interesting question which, unfortunately, was neither raised, tried nor decided by the court below: Since the claim of the marital entity is indeed separate and apart from an injured party's individual claim, does it have a separate cap or is it subsumed into the individual claim for the purpose of applying the cap? We leave the answer for another day.

known risks attendant to such conduct. *Thorne v. Contee*, 80 Md.App. 481, 489, 565 A.2d 102 (1989).

Appellees argue that, as to appellant Port East, the jury could well have believed that the condition of the tire was known to the company, and the company "just took a chance." This, they assert, would be evidence of a reckless disregard for the safety of others legally sufficient for the jury to exercise its discretion in awarding punitive damages.

As to appellant Edmonds, appellees contend that his insistence that he inspected the tire, combined with expert witness Emanuel Zambelas's testimony as to the tire's defective condition, would allow the jury to reasonably conclude that Edmonds also decided to take a chance that the tire would not blow despite the risk of harm to himself and others if it did blow out. Appellees argue further that Edmonds's realization of the risk involved is reflected in his alleged statement that "... the front tire blew out ..., I was afraid for my life and I jumped on the floor of the cab, thought I was going to die."

Upon review of the evidence, we hold that there is insufficient evidence to hold that either Port East's or Edmonds's conduct was grossly negligent based on the notice of a "defective tire" alleged at trial. We further hold that testimony as to Edmonds's conduct subsequent to the tire blowout was not legally sufficient to establish gross negligence.

On the issue of whether notice of a punctured tire was evidence of a reckless disregard for the safety of others, we believe, *Baublitz v. Henz*, 73 Md.App. 538, 535 A.2d 497 (1988), is controlling. In *Baublitz*, we held that evidence as to size and weight of a truck, together with evidence as to "worn" brakes, while sufficient to support a finding of ordinary negligence of the employer in entrustment of the vehicle to an employee, was not sufficient to show extraordinary and outrageous conduct amounting to wanton and reckless disregard for human life. Thus, such evidence did not support an award of punitive damages against the

172

employer. In reaching that decision, this court relied on the fact that the only testimony of prior knowledge of the defective brakes was (1) testimony from the truck driver that he had reported to his supervisor a statement of another driver that the brakes were "worn," and (2) the testimony of the plaintiff that he heard the driver say that "he told his supervisor a ways back or a while back that something was wrong with the brakes." *Id.* at 547, 535 A.2d 497.

Contrasting *Baublitz* with the case *sub judice*, we perceive no further justification for submitting the issue of punitive damages against either appellant. The only evidence of prior knowledge of a defective tire was the testimony of appellees' expert witness, Zambelas, that the holes in the tire would have been noticeable by an exterior inspection. In fact, testimony indicated that evidence of the rusting of the belts of the tire caused by defective repair,[27] the major cause of the blowout, was not visible on exterior inspection. Although such evidence may give rise to simple negligence, it is not demonstrative of extraordinary and outrageous conduct amounting to wanton and reckless disregard for human life.

Appellees further contend, however, that Edmonds's alleged reaction to the tire blowout, diving onto the floor of the truck of the cab, constituted a wanton or reckless disregard for human life. On the basis of respondeat superior then, they argue, Port East would be liable for punitive damages.

Upon reviewing the record, we conclude that here again the evidence is not sufficient to find gross negligence. Therefore, we hold that the trial court erred in denying appellants' motions for judgment on the issue of punitive damages.

In ruling on a motion for a directed verdict, the trial court must assume the truth of all credible evidence on the issue

27. The repair was made on the road and not by Port East.

and of all inferences fairly deducible therefrom, and must consider them in the light most favorable to the party against whom the motion is made. *Tippett v. Quade,* 19 Md.App. 49, 56, 309 A.2d 481 (1973). This is not to say, however, that the issue should go to the jury in every case where a party has introduced some evidence of negligence. *Id.* If the direct evidence approaches the outer limits of credibility, it would be insufficient. *Id.*

In the case *sub judice,* the vice president of Port East testified that Edmonds told him in the hospital that he was scared for his life and jumped onto the floor of the cab. Appellees argue that the jury could believe that Edmonds "abandoned ship" in order to save himself and allowed the truck to cross over into the oncoming lanes of traffic without even attempting to brake. This conduct alone may not be sufficient to establish prima facie evidence of willful and wanton conduct.

As the Court of Appeals stated in *Warnke v. Essex,* 217 Md. 183, 141 A.2d 728 (1958):

> The relevant inquiry, then, is whether an ordinarily prudent person would have acted in the same manner as the defendant did in this case. The mere fact that a person finds himself in a predicament or emergency does not automatically relieve him of the obligation to use ordinary care. The amount of care might change, of course, but the degree or standard of *ordinary care* is always the same, *i.e.,* the care that would be used by an ordinarily prudent person under the same circumstances, the emergency itself always being considered and weighed as one of the circumstances.

*Id.* at 187, 141 A.2d 728 (emphasis in original). In judging Edmonds's actions in light of the emergency circumstances with which he was confronted, we consider that some courts have held that the law imposes no rule of conduct upon one who is suddenly confronted by impending danger, and is compelled to act, not by the dictates of reason but by the instinct of self preservation. *Barnhardt v. American Glycerine Co.,* 113 Kan. 136, 213 P. 663, 665 (1923) (court

held that individual whose automobile loaded with nitroglycerine was stuck on a steep hill, was not guilty of actionable negligence in abandoning the automobile when he discovered it was on fire). *See also Donahue v. Kelly,* 181 Pa. 93, 37 A. 186 (1897) (court held that an individual was not liable for culpable negligence to a third person injured when the individual, burned severely by a lamp he was carrying, threw it and it exploded); *State v. Sims,* 138 W.Va. 482, 77 S.E.2d 151 (1953) (court held that where a fire occurred in a garage and spread immediately to the clothing of a mechanic, the mechanic was not guilty of negligence in his unsuccessful efforts to extinguish or check the fire in the garage even though he initially ran outside to extinguish his own clothing).

We base our holding, however, not on the emergency doctrine but rather on our determination that the direct evidence at trial approaches the outer limits of credibility. *See Tippett, supra.*

As discussed above, there exists contested testimony that Edmonds dove onto the floor of the cab because he was afraid for his life. Appellees would have us infer that such conduct occurred immediately upon the blowout of the tire and without any previous efforts of Edmonds to gain control over the vehicle. We are also faced, however, with undisputed evidence that Edmonds had applied his brakes from the beginning to the end of the emergency. This was illustrated by the post-accident photographs supplied by Trooper Boyd, showing skid marks all the way across the road, as well as by his testimony. Evidence and inferences deducible therefrom that Edwards immediately dove to the floor are incredible when considered together with evidence that he applied the brakes throughout the incident. Courts retain the power to set the limits of what is credible evidence. *Tippett, supra,* 19 Md.App. at 57, 309 A.2d 481.

We are unswayed in our view by the possibility that Edmonds may have "taken a dive" after failing to regain control through application of the brakes but prior to the

collision. We hold as a matter of law that evidence of such conduct at that point in time considering the emergency circumstances, would be insufficient to constitute gross negligence.

■■ We are convinced, on the other hand, that appellees presented evidence sufficient to justify an award of compensatory damages against either appellant. Viewing the evidence in the light most favorable to appellees, the jury could have reasonably believed that the tire holes were noticed and ignored by the company or would have been noticed had the driver made a reasonable inspection.

Appellant contends that there is insufficient evidence to establish negligence since the only testimony offered by appellees as to what inspection procedure of the tire was "proper" or "reasonable" or as to what inspection actually took place was that of Edmonds himself. We disagree.

■■ We cite again the testimony of appellees' expert witness, Zambelas, that the holes in the tire would have been observable through an exterior inspection and that the driver probably did not do a good job of inspecting the tire if he did not see the holes. Furthermore, Edmonds's testimony at trial is contradicted on several occasions by his deposition testimony. The deposition testimony read into the record at trial indicated that Edmonds had stated the following: Edmonds's supervisor told him he was late and should hurry; Edmonds was going 59 or 60 m.p.h.; the employees in the shop told him that the tire that later blew out was a new tire; he was "pushing it" because he was late; and that he did not touch the brakes. Edmonds denied, or claimed not to remember, making any of the above statements. We hold that Zambelas's testimony, in conjunction with the inconsistent testimony of Edmonds, provided sufficient evidence from which a jury could infer that both Port East and Edmonds were negligent of either failing to inspect the tire or ignoring notice of a punctured tire.

## V. & VI. JURY INSTRUCTIONS

Appellants also contend, on appeal, that the lower court erred in failing to instruct the jury on the doctrine of sudden emergency and in failing to instruct the jury regarding the Murphys' burden to establish notice of the defect. Appellants had provided the judge with requested instructions on each of these points.

Appellees counter that the issues are not properly preserved for our review under Maryland Rule 2–520. This rule provides in pertinent part:

> No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.

Subsequent to the court's instructions to the jury, appellants' counsel made the following exception:

> Your Honor, Instructions 11 through 37 that we have presented to you talk about basically the elements of negligence as it pertains to the plaintiffs' case, and I don't believe from the instructions that were given the jurors are going to be able to differentiate between the driving and what happened subsequent to the blowout, the cause of the blowout, patching of the tire or all of the other elements that are a part of what the plaintiff is required to prove. Your instructions, although they define "negligence," did not break it down with regard to the plaintiffs' burden of proof as to what would constitute negligence, and I feel without giving Instructions 11 through 37, that they will not be able to make that type of determination.

Appellees argue that this exception is inadequate to preserve this issue for appellate review under the holding in *Belt's Wharf Whses., Inc. v. International Products Corp.*, 213 Md. 585, 132 A.2d 588 (1957). There the court held that mere reference to numbers of proposed instructions that the court has declined to grant is clearly insufficient to

preserve the issue on appeal. Appellants counter that *Sergeant Co. v. Pickett*, 283 Md. 284, 288, 388 A.2d 543 (1978), not *Belt's Wharf, supra,* is controlling here. In *Sergeant Co., supra,* the court held that reference to a written prayer by number and subject matter, coupled with the court's implicit acknowledgment that it comprehended the point being asserted, was substantial compliance with the applicable Maryland Rule.

In the instant case, it is far from certain that the trial judge actually comprehended the point being asserted. A review of the record fails, at least, to indicate any explicit or implicit acknowledgment of such comprehension.

Appellants' exception makes reference to twenty-six of a total of fifty-one instructions submitted to the court. This exception to the court instructions complains that the instructions, although they define negligence, did not break it down with regard to the Murphys' burden of proof as to what would constitute negligence. Appellants' counsel, however, made no specific reference to the court's failure to instruct as to "notice of defect" or the "emergency doctrine."

Furthermore, after hearing appellants' exception and then discussing with counsel the adequacy of other instructions dealing with punitive damages and future medical damages, the court responded:

> All right. Well, I'll take care of that for you. But as to the others, I think I've covered all of the issues, so I'm not going to at this point say anything other than the clarification that's been requested about punitive damages. Depending upon what's said by either side or both sides concerning the theories of liability, I may then supplement my instructions. But I didn't want to get into *rules of the road and all of that stuff,* other than to simply say the things I did say about that.

(Emphasis added.) This response does not indicate that the trial judge was aware that counsel was concerned specifically with an instruction as to the burden of proof on the

notice of defect or an instruction as to the emergency doctrine. Appellants' counsel subsequently failed "to state distinctly the matter to which [he] object[ed]." The purpose of the relevant Maryland Rule is to allow the trial court to correct any inadvertent error or omission in the oral charge as well as to limit the review on appeal to those errors which are brought to the trial court's attention. *Sergeant Co.*, 283 Md. at 288, 388 A.2d 543. In this manner, the trial judge is afforded an opportunity to amend or supplement his charge if he deems an amendment necessary. *Id.* We do not believe that the trial judge was afforded such an opportunity and thus the purposes of Rule 2–520 were not adequately served by the exception taken here. We hold, then, that this issue is not preserved for our review.[28]

## VII. MOTION FOR REMITTITUR

Appellants contend that the trial court erred in denying their Motion for Remittitur or In the Alternative New Trial, pursuant to Rule 2–533. They argue that punitive damages may not be apportioned between defendants where liability is derivative. We need not address this issue, however, as our holding on the earlier punitive damages issue renders this question moot.

## SUMMARY

1. Award in the amount of $245,000 (for "household services") in favor of appellees is affirmed;

---

**28.** We note that appellants' contention that the trial court erred in failing to instruct the jury on the doctrine of sudden emergency and in failing to instruct the jury regarding plaintiffs' burden to establish notice of the defect, has merit.

A litigant is entitled to have his theory of the case presented to the jury, if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it. *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651 (1979). The instructions in question met these criteria.

Of course, the court need not grant a requested instruction if the matter is fairly covered by the instructions. We do not believe, however, that the trial judge's general negligence instructions covered the matters in question.

2. Awards in the amount of $3,000 and $1,000,000 (for punitive damages against Edmonds and Port East) are reversed;

3. Award of $552,165.31 (for compensatory damages) to Sarah Murphy is reduced to $392,165.31.

JUDGMENTS AFFIRMED IN PART AND REVERSED IN PART; ½ COSTS TO BE PAID BY APPELLANTS; ½ COSTS TO BE PAID BY APPELLEES.